EASTERN MARBLE PRODUCTS CORP. *vs.* ROMAN MARBLE, INC. & others.[1]

Middlesex.    November 3, 1976. — June 23, 1977.

Present: QUIRICO, BRAUCHER, WILKINS, & LIACOS, JJ.

*Trade Secret. Minor. Contract,* With minor. *Unfair Competition. Practice, Civil,* Action to enjoin competition.

An injunction against a manufacturer of marble products to prevent it from producing two-tone sinks was warranted by the fact that the process involved was a trade secret even though the process for making similar sinks of one color was not. [838-840]

Evidence in an action by a corporation to enjoin a rival manufacturer of marble sinks from using information acquired by former employees to produce a two-tone sink warranted a finding that the corporation had taken measures to guard the secrecy of the information. [840]

The duty of a former employee of a corporation not to use or disclose confidential information acquired in the course of his employment did not turn on the existence of a legally enforceable contract. [840-842]

An action in which a judge granted a permanent injunction against a manufacturer of marble sinks preventing it from producing two-tone sinks on the ground that the process for such production was obtained through disclosure of trade secrets was remanded to permit inquiry as to whether the process remained a trade secret. [842-843]

BILL IN EQUITY filed in the Superior Court on September 12, 1973.

The suit was heard by *Zarrow,* J.

After review was sought in the Appeals Court, the Supreme Judicial Court, on its own initiative, ordered direct appellate review.

*Philip X. Murray* for Irving Cann.

*Camille F. Sarrouf* (*Howard J. Alperin* with him) for the plaintiff.

---

[1] Irving Cann and Richard E. McEachern, Jr. The case against Serope M. Mardirosian, named in the original complaint, was dismissed at the request of the plaintiff.

QUIRICO, J. The plaintiff Eastern Marble Products Corp. (Eastern Marble) brought a bill in equity to enjoin Irving Cann and Robert E. McEachern, Jr., former employees of Eastern Marble, from using or disclosing Eastern Marble's trade secrets involved in the manufacture of synthetic ("cultured") marble sinks.

A judge of the Superior Court ruled that the process of manufacturing cultured marble sinks was not a trade secret. He also ruled that the process of manufacturing two-tone one-piece sinks, with the top one color and the bowl another color, was a trade secret. Based on the finding of an "express employee agreement for nondisclosure" between Eastern Marble and McEachern the judge enjoined McEachern from disclosing or making use of Eastern's trade secrets. Based on a finding that Cann "wrongfully obtained the process for the manufacture of a two-tone cultured marble top and bowl," the judge enjoined Cann from manufacturing two-tone one-piece cultured marble tops and bowls.

From the record before us, it appears that McEachern has not appealed from the final decree.[2] Cann, the only defendant presently before the court, appealed to the Appeals Court, and we transferred the case here. G. L. c. 211A, § 10 (A). For reasons hereafter stated, we agree with the judge's conclusions, but remand the case to permit the parties to be heard on the matter of the duration of the injunction.

We summarize the facts found by the trial judge. Eastern Marble is a Massachusetts corporation organized in 1970. It entered into a franchise agreement with Marble-

---

[2] A claim of appeal from the final decree was filed on behalf of an unidentified "respondent" by attorney Philip X. Murray. The docket reflects an appeal by a singular "defendant." A brief entitled "Brief for the Defendant-Appellant Irving Cann" was filed by the same attorney, who at oral argument stated that he represented Roman Marble and Irving Cann. Nothing before us suggests that McEachern has claimed or participated in an appeal. The trial judge's finding on October 31, 1973, that at that time McEachern was no longer employed by Roman Marble may explain this circumstance.

Crete Products, Inc. (Marble-Crete), permitting manufacture of simulated marble sinks according to a formula and process furnished by Marble-Crete.

Sometime thereafter Eastern Marble and Marble-Crete developed a method of manufacturing a one-piece molded sink with the flat surface top of one color and the washbowl of another color. Peter Kevorkian, the president of Eastern Marble, experimented for several months to develop the process. Formulae for the manufacture of cultured marble are available to the public. Yet, of the approximately 100 manufacturers of cultured marble in the United States, twenty-one of whom are licensed by Marble-Crete, Eastern Marble and Marble-Crete alone have manufactured one-piece two-tone sinks.

The employees of Eastern Marble were instructed to keep the public out of the manufacturing area where various formulae and notes regarding production were posted. Further, all the employees who were involved in manufacturing were obliged to sign agreements to the effect that they had learned the methods, procedures, and formulae of Eastern Marble and Marble-Crete for "the sole purpose of assisting in manufacturing said products," that they would not disclose these methods to anyone, and that they would "not . . . enter any business of this nature" except as a franchisee.

McEachern began work for Eastern Marble as a college student in September, 1970, and, except for short intervals, remained until April, 1973. He signed a nondisclosure and noncompetition agreement on September 28, 1970, which was before the two-tone process had been developed.

Cann, who had been a manufacturer's representative in the plumbing industry for about sixteen years, became a factory representative for Eastern Marble in 1972. He did not sign a nondisclosure and noncompetition agreement. On June 19, 1973, while still an employee of Eastern Marble, Cann incorporated Roman Marble, Inc. (Roman Marble), as a Massachusetts corporation, for the purpose of manufacturing cultured marble sinks. Cann quit Eastern Marble on July 1, 1973. Roman Marble soon hired

two former employees of Eastern Marble, including Mc-Eachern, who had left Eastern Marble in April, 1973.

With the aid of a handbook published by Gruber Systems, Inc., a California corporation, and telephone advice from them, Roman Marble obtained the information necessary to manufacture cultured marble. Roman Marble was able to develop a finished product for sale sometime between July 28, 1973, and August 3, 1973.

Cann had not witnessed the manufacture of cultured marble sinks at Eastern Marble, and had not obtained copies of Eastern Marble's formulae. He had obtained the special expertise and knowledge required to make two-tone one-piece cultured marble tops and bowls from Mc-Eachern. It is this special knowledge which the trial judge ruled was a trade secret. He further ruled that this knowledge had been unlawfully obtained through the hiring of McEachern.

1. Cann challenges on several grounds the finding that the manufacture of two-tone cultured marble sinks involves a trade secret.

A persistent theme of the defendant's attack is that the process of manufacturing two-tone sinks cannot be distinguished from that used to make sinks of one color. The defendant argues that, since the judge found the method of producing sinks of one color to be generally available to the public and not a trade secret, the process of making two-tone sinks cannot be a trade secret. A corollary to this argument is that an injunction prohibiting the manufacture of an end product — two-tone sinks — rather than the use of a particular process is too broad. We disagree with these contentions.

In *J.T. Healy & Son* v. *James A. Murphy & Son*, 357 Mass. 728, 736 (1970), we cited the comprehensive definition of trade secret adopted by the Restatement of Torts § 757, Comment b: "A trade secret may consist of any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it. It may be . . . a process of manufac-

turing .... A trade secret is a process or device for con-
tinuous use in the operation of the business. Generally it
relates to the production of goods, as, for example, a ma-
chine or formula for the production of an article."

Our prior cases establish that manufacturing processes
are entitled to protection as trade secrets. *J.T. Healy &
Son* v. *James A. Murphy & Son,* 357 Mass. 728, 736 (1970).
*Junker* v. *Plummer,* 320 Mass. 76, 79-80 (1946). *Wireless
Specialty Apparatus Co.* v. *Mica Condenser Co.,* 239 Mass.
158, 165 (1921). What is a trade secret depends in each
case "on the conduct of the parties and the nature of the
information." *Jet Spray Cooler, Inc.* v. *Crampton,* 361
Mass. 835, 840 (1972).

While the evidence in this case does not permit a crisp
distinction between the process of manufacturing two-tone
and one-tone sinks, the judge found that the defendant
misappropriated the information necessary to create two-
tone sinks. He apparently relied on the fact that no manu-
facturer other than Eastern Marble produced two-tone
sinks.[3] His injunction against the manufacture of the prod-
uct itself, rather than against the use of a particular pro-
cess, appears to reflect his judgment that, at the very
least, the process and the product are inextricably con-
nected. We see no reason to disturb his judgment.

The nebulous distinctions between process and product
urged by the defendant cannot be sustained on the facts
of this case. It appears clear from the evidence and the
judge's findings that the defendant was able to produce
two-tone sinks only because he hired McEachern to use
the techniques developed by Eastern Marble. Although
technical information about the general process of manu-
facturing cultured marble was available from Gruber Sys-
tems, Inc., Roman Marble could not have produced the
two-tone product without McEachern's knowledge. Thus,
to permit the defendant to prevail because of the analyti-

---

[3] See *Junker* v. *Plummer,* 320 Mass. 76, 78 (1946), where "there was
no other machine 'faintly resembling ... [the plaintiff's machine] in use
anywhere.' "

cal difficulties in distinguishing the manufacture of two-tone and one-tone sinks would be to ignore the factual context in which the case arises.[4]

Thus, in so far as the defendant's argument is based on this distinction, we find it without merit.

The next claim is that the plaintiff did not treat the process of manufacture as a secret and should not be extended legal protection after the fact. "The essential characteristic of a trade secret being secrecy," *J.T. Healy & Son* v. *James A. Murphy & Son, supra* at 737, we must examine the plaintiff's behavior to determine the extent of measures taken to guard the secrecy of the information.

Each manufacturing employee of Eastern Marble was required to sign an agreement not to disclose the methods and procedures involved in the manufacturing processes of Eastern Marble and Marble-Crete. While McEachern's signing of this agreement preceded the development of the two-tone process, and while the agreement may have been specifically directed to protect formulae purchased by Eastern Marble from the franchisor Marble-Crete, this agreement by its terms included all the proprietary and secret information involved in the manufacturing process. Such an agreement cannot be disregarded as an empty formality. At the very least it put the employees on notice that secrets were involved. Cf. *New Method Die & Cut-Out Co.* v. *Milton Bradley Co.*, 289 Mass. 277, 281-283 (1935). Moreover, the manufacturing area was separated from those business activities involving contact with the public; manufacturing employees were told to keep the public out of the area. These various measures support the judge's finding that the necessary secrecy was preserved.

2. Cann next argues that the judge erred in finding that

---

[4] See R.M. Milgrim, Trade Secrets § 7.08[1][b] (1976): "Misappropriation of a process, formula or other trade secret matter used in the manufacture or preparation of a product is generally sanctioned by a restraint on the use of the process, formula or other trade secret. If, however, the secret is inextricably connected with defendant's manufacture of the product the court may enjoin defendant from making the product itself."

he unlawfully obtained information from McEachern. He argues that this finding must mean that McEachern violated his contract with Eastern Marble. He further argues that the contract was not violated because McEachern was a minor at the time of signing the contract, that the contract was therefore voidable, and that he disaffirmed the contract by going to work for Roman Marble. The judge made no express findings on the issue of infancy, and Cann did not file a motion requesting the judge to amend his findings or to make additional findings. Mass. R. Civ. P. 52 (a), 365 Mass. 816 (1974). *Building Inspector of Lancaster* v. *Sanderson, ante,* 157, 161 (1977).

There is testimony from which it could be found that McEachern was hired by Eastern Marble when he was nineteen years old in September, 1970.[5] He quit his work at Eastern Marble in April, 1973; he began work for Roman Marble in August, 1973. Cann argues that the employment at Roman Marble was McEachern's first opportunity to disaffirm the contract, and that he did so disaffirm. See *Slaney* v. *Westwood Auto, Inc.,* 366 Mass. 688, 692-693 (1975); *Southern New England Ice Co.* v. *Ferrero,* 295 Mass. 446, 448-449 (1936). Although we think that the judge would have been warranted in finding a ratification of the contract (see *Reed* v. *Batchelder,* 1 Met. 559 (1840); 1A A. Corbin, Contracts § 227 [1963]; Annot., 17 A.L.R.3d 863 [1968]), we need not rest our opinion on this ground.

It is settled by our cases that the duty of an employee *not to disclose confidential information is grounded on* " 'basic principles of equity' ... and upon an implied contract, growing out of the nature of the employer-employee relation." *Jet Spray Cooler, Inc.* v. *Crampton,* 361 Mass. 835, 839 (1972).

In *New England Overall Co.* v. *Woltmann,* 343 Mass. 69, 75 (1961), we said the following: "In situations where there has been no express contract of an employee not to

---

[5] See St. 1973, c. 925, § 74, inserting G. L. c. 231, § 85 O; Hamann, Eighteen: The New Age of Majority in Massachusetts — An Analysis of Recent Legislation, 59 Mass. L.Q. 17 (1974).

use or disclose confidential information entrusted to him during his employment, this court has held that, although an employee may carry away and use general skill or knowledge acquired during the course of his employment, he may be enjoined from using or disclosing confidential information so acquired. *Essex Trust Co.* v. *Enwright*, 214 Mass. 507, 511 [1913]. *Aronson* v. *Orlov*, 228 Mass. 1, 4-5 [cert. denied, 245 U.S. 662 (1917)]. *Wireless Specialty Apparatus Co.* v. *Mica Condenser Co. Ltd.*, 239 Mass. 158 [1921]. *Horn Pond Ice Co.* v. *Pearson*, 267 Mass. 256, 261 [1929]. *Junker* v. *Plummer*, 320 Mass. 76, 79 [1946]. In these cases injunctive relief was granted on the theory that 'out of the "relationship of employer and employee certain obligations arise, including that which precludes an employee from using, for his own advantage or that of a rival and to the harm of his employer, confidential information that he has gained in the course of his employment." ' *Junker* v. *Plummer*, 320 Mass. 76, 79 [1946], and cases cited." See Restatement (Second) of Agency § 396 (1958); Annot., 30 A.L.R.3d 631 (1970).

This duty does not necessarily turn on the existence of a legally enforceable contract. The judge was therefore warranted in finding that Cann unlawfully obtained trade secrets through hiring McEachern, regardless of the possible question of McEachern's minority.

3. This case was originally decided by the judge more than three years ago; it is possible that the remedy of a permanent injunction may no longer be appropriate. It is clear that injunctions granted to prevent trade secret violations must be reasonable as to time. *New England Overall Co.* v. *Woltmann*, 343 Mass. 69, 78 (1961). As we recently stated in *Analogic Corp.* v. *Data Translation, Inc.*, 371 Mass. 643, 647 (1976), "Of course an injunction is not unreasonable merely because it is permanent, *Tobin* v. *Cody*, 343 Mass. 716 (1962), and what is reasonable will depend in each instance on the facts in the particular case. *Novelty Bias Binding Co.* v. *Shevrin*, [342 Mass. 714] at 716 [1961], and cases cited." In the *Analogic Corp.* case, *supra* at 648-649, we suggested that "one factor which should be consid-

ered in determining the reasonableness of the scope ... of an injunction" was "the amount of time necessary to reverse engineer the plaintiff's device without improper use of trade secrets." We said that "[t]he plaintiff is entitled to have its trade secrets protected at least until others in the trade are likely, through legitimate business procedures, to have become aware of these secrets. And even then the defendants should not be permitted a competitive advantage from their avoidance of the normal costs of invention and duplication." See R.M. Milgrim, Trade Secrets § 7.08[1] (1976); Annot., 38 A.L.R.3d 572 (1971).

Those factors bear repetition here, particularly where the judge expressly found that in 1973 no other manufacturers of cultured marble made two-tone sinks. Where so much argument has been devoted to the difficulties of separating the process of manufacturing from the end product itself, it may be appropriate to permit renewed inquiry into the present state of the cultured marble market, and whether the permanent injunction was overbroad and thereby affords excessive protection to the plaintiff's interests. *Wilson* v. *Jennings,* 344 Mass. 608, 620-621 (1962). We do not foreclose the possibility that the permanent injunction may remain proper; we simply permit a reexamination to determine if the process truly remains a trade secret. See *K-2 Ski Co.* v. *Head Ski Co.,* 506 F.2d 471, 474-475 (9th Cir. 1974). For this reason, we reverse the final decree, solely to permit the parties to be heard on the matter of duration of any new injunction which may be entered.

*So ordered.*