**GENERAL ELECTRIC COMPANY and Norton Company, Plaintiffs,**

v.

**Chien–Min SUNG, et al., Defendants.**

**Civ. A. No. 89–40094–GN.**

United States District Court,
D. Massachusetts.

Jan. 4, 1994.

Vicki V. Bonnington, Diane M. Kottmyer, Bingham, Dana & Gould, Boston, MA, Salem M. Katsh, Steven A. Reiss, Beth Neelman, Weil, Gotshal & Manges, New York City, for General Elec. Co.

Henry C. Dinger, Goodwin, Proctor & Hoar, Boston, MA, for Norton Co.

Richard A. Gargiulo, Gargiulo, Rudnick & Gargiulo, Boston, MA, for Chien–Min Sung and United Machinery, Inc.

Hsu–Yin Wang, pro se.

Bruce R. Parker, Michael B. Keating, Bradford G. Swing, Foley, Hoag & Eliot, Boston, MA, for Iljin Corp., Iljin Diamond Mfg. Co., Ltd., Iljin Elec. and Machinery Co., Ltd., Iljin Light Metal Co., Ltd., Chin Kyu–Huh.

Bruce R. Parker, Michael B. Keating, Foley, Hoag & Eliot, Boston, MA, for Imec Corp.

James S. Dittmar, Leonard G. Learner, Hutchins & Wheeler, Boston, MA, for Shenzhen Asia Diamond Co.

Leonard G. Learner, Hutchins & Wheeler, Boston, MA, for China Resources Machinery & Equipment Co., Ltd.

Martha B. Sosman, Kern, Sosman, Hagerty, Roach & Carpenter, Boston, MA, Randall L. Nash, Annette M. Kingsland, O'Neil, Cannon & Hollman, Milwaukee, WI, James L. Siekmann, Kay E. Rickelman, Hill, Van Santen, Steadman & Simpson, Chicago, IL, for Elwood Hydraulics Co. Inc.

Albert Hayeck, Worcester, MA, for Philip T. Delmer.

Henry J. Boroff, Boroff & Associates, Boston, MA, for Commerce Bank & Trust Co.

Jeffrey R. Larsen, Fidelity Brokerage Services, Inc., Boston, MA, for Fidelity Brokerage Services, Inc.

## MEMORANDUM OF DECISION

GORTON, District Judge.

Pending before this Court is the motion of plaintiff, General Electric Company ("GE"), filed on August 18, 1993, for injunctive relief against Iljin Corporation, Iljin Diamond Manufacturing Company and Chin–Kyu Huh (collectively, "Iljin"). A hearing was held on GE's motion on November 24, 1993. This Court has considered all memoranda in support of and in opposition to GE's motion, as well as oral arguments of counsel.

### I. Background

Chien–Min Sung ("Sung"), a geochemistry Ph.D., ended a seven-year employment relationship with GE Superabrasives in March 1984. When he left GE, Sung took with him an abundance of documents, including drawings and process instructions relating to the production of industrial synthetic diamond. In 1988, Sung and Iljin entered into several agreements under which Sung agreed to transfer to Iljin technology related to the production of industrial diamond.

GE filed an action against Iljin in 1989, alleging, *inter alia,* that they misappropriated GE trade secrets relating to the technology for manufacturing saw grade industrial diamond. After protracted discovery and pre-trial motions, the case was tried to a jury in July, 1993. At the close of the three-week trial, the Court charged the jury that, in order to find that Iljin had misappropriated any of the claimed GE trade secrets, comprised of 487 pages of documents contained in trial Exhibit A, it must find, among other things, that the documents in Exhibit A: 1) were valuable, 2) were not in the public domain, 3) were kept secret by GE, 4) were copied or derived by Sung from confidential GE documents in violation of his legal obligations to GE, 5) were obtained by Iljin with actual or constructive knowledge of those facts, and 6) were used by Iljin. On July 30, 1993, the jury returned a verdict in favor of GE and against Iljin for misappropriation of GE trade secrets.

GE waived its legal remedy with respect to its alleged lost profits and Iljin's alleged unjust enrichment when it chose not to offer evidence of such monetary damages at trial. On November 15, 1993, this Court denied GE's Motion for Reconsideration of its Request for an Equitable Accounting.

### II. Discussion

■ It is well settled that equity will protect against the unwarranted use of a trade secret. *See generally* 3 R. Milgrim, *Milgrim on Trade Secrets,* § 15.02[1][a]. The purpose of an injunction in a trade secret case is to protect the secrecy of the misappropriated information, eliminate the unfair advantage obtained by the wrongdoer and reinforce the public policy of commercial morality. *Kewanee Oil Co. v. Bicron Corp.,* 416 U.S. 470, 481, 94 S.Ct. 1879, 1886, 40 L.Ed.2d 315 (1974). An injunction to protect against the use of a trade secret is the appropriate remedy in a trade secret case if, absent such relief, plaintiff will suffer irreparable injury. *See A–Copy, Inc. v. Michaelson,* 599 F.2d 450, 452–453 (1st Cir.1978).

■ The jury found that Iljin misappropriated GE trade secrets and the evidence at trial clearly indicated that Iljin's use of those trade secrets enabled them to produce saw grade diamond for commercial sale and thereby to compete with GE in the industrial diamond industry before it would have been otherwise possible. This Court concludes that GE will suffer irreparable injury if Iljin is allowed to continue to use the technology it wrongfully acquired from GE, and an injunction is therefore the appropriate remedy in this case. The only remaining issues to be decided by this Court relate to the scope, nature and duration of that injunction.

#### A. *Scope of Injunction*

■ The jury found that Iljin misappropriated 487 pages of documents that were GE trade secrets. Trade secret protection, however, extends not only to the misappropriated trade secret itself but also to materials "substantially derived" from that trade secret. *USM Corp. v. Marson Fastener Corp.,* 392 Mass. 334, 351, 467 N.E.2d 1271, 1284 (1984); *Rockwell Graphic Systems, Inc. v. DEV Industries, Inc.* 1993 WL 286484 (N.D.Ill. July 29, 1993). This Court must, therefore, deter-

mine whether an injunction in this case should be limited to the documents contained in trial Exhibit A or extend to cover Iljin's IJ–77 process.

■ The IJ–77 process is a 5,000–ton apparatus and specifications for its operation. It is designed and used to produce saw grade diamond on a commercial scale. The evidence at trial indicates that it took GE more than twenty years to develop its comparable, 5,000–ton "GE V" design for commercial production of saw grade diamond. Taek–Jung Shin ("Shin"), the Engineering Manager of Iljin Diamond, admitted at trial that 1) the IJ–77 design was developed by Iljin engineers with explicit reference to the GE trade secrets and 2) in creating the IJ–77, Iljin engineers modified the GE V design to make it "less aggressive". Shin himself was intimately familiar with the GE trade secret technology and supervised the development of the IJ–77 design. Under Massachusetts trade secret law, these facts give rise to a compelling inference that the IJ–77 was substantially derived from GE trade secrets.

> Where modifications in the process are made by persons cognizant of the trade secret … proof of the independent derivation of the differing process is more difficult than would be the case if an apparent "modification" were made by a person untainted with knowledge of the trade secret.

*USM Corp.*, 392 Mass. at 352, 467 N.E.2d 1271.

The physical evidence sustains the inference. The evidence adduced from pretrial depositions, expert trial testimony and post-trial affidavits indicates that the dimensions and material specifications of the IJ–77 are substantially similar, and in some respects identical, to GE's L–5000 and M–3000 designs in Exhibit A. *See id* (plaintiff entitled to relief where defendant's machine is substantially similar to the machine incorporating a trade secret). Moreover, specific expert testimony indicated that 25% of the dimensions of the IJ–77 die and anvil are identical to the GE V dimensions.

Iljin argued at trial that the documents in Exhibit A were not used by Iljin and were not valuable. They attempted to establish that defense by showing that the documents were not necessary to the creation of the IJ–77. GE countered by offering evidence of a nexus between the stolen documents and the IJ–77. The jury found that the GE trade secrets had value and were used by Iljin, and therefore implicitly rejected Iljin's contention that there was no connection between the stolen documents and the IJ–77.

This Court concludes that the IJ–77 was substantially derived from the 487 pages of documents determined by the jury to be GE trade secrets. Any injunction to preclude Iljin from exploiting their wrongfully obtained competitive advantage must therefore enjoin Iljin from, among other things, using the IJ–77.

### B. *Nature of Injunction*

There are two kinds of trade secret injunctions potentially applicable in this case. The Court could permanently enjoin Iljin from using the misappropriated information, i.e., impose a "use injunction". Because the Court has determined that the IJ–77 was substantially derived from the GE trade secrets in Exhibit A, any use injunction would necessarily enjoin Iljin from using the IJ–77. Alternatively, the Court could enjoin Iljin from manufacturing saw grade diamond for a certain amount of time, i.e., impose a "production injunction". For the reasons stated below, the Court concludes that a production injunction is the most effective and appropriate way to remedy the misappropriation of trade secrets in this case.

■ Courts have imposed production injunctions in circumstances where a use injunction would be ineffective in eliminating the competitive advantage gained by the misappropriator. *See, e.g., Viscofan, S.A. v. U.S. Int'l Trade Comm'n,* 787 F.2d 544 (Fed. Cir.1986) (prohibition on sale of sausage casings); *Aerosonic Corp. v. Trodyne Corp.,* 402 F.2d 223 (5th Cir.1968) (injunction against making or selling pressure sensing devices); *Head Ski Co. v. Kam Ski Co.,* 158 F.Supp. 919, 923 (D.Md.1958) (prohibition on manufacturing adhesively bonded metal skis); *Eastern Marble Products Corp. v. Roman Marble, Inc.,* 372 Mass. 835, 838, 364 N.E.2d 799 (1977) (injunction against manufacturing

two-tone, one-piece marble sinks). The common rationale for imposing a production injunction is that, where the misappropriated trade secrets are "inextricably connected" to the defendant's manufacture of the product, a use injunction is ineffective because the misappropriator cannot be relied upon to "unlearn" or abandon the misappropriated technology. *See Eastern Marble*, 372 Mass. at 839, 364 N.E.2d 799; *see generally* 3 R. Milgrim, *Milgrim on Trade Secrets*, § 15.-02[1][l] ("If ... the secret is inextricably connected with defendant's manufacture of the product, the court may enjoin defendant from making the product itself.").

■ An "inextricable connection" is found where the trade secrets form such an integral and substantial part of a comprehensive manufacturing process or technology that, absent the misappropriated trade secrets, the defendant would not be able independently to manufacture or design a comparable product. *See Head Ski Co.*, 158 F.Supp. at 924; *Eastern Marble*, 372 Mass. at 839, 364 N.E.2d 799. In that respect, it is pertinent whether the defendant had a significant and comparable, pre-existing design of its own prior to the misappropriation of the trade secrets. *See Aerosonic Corp.*, 402 F.2d at 228.

■ In 1988, Iljin contracted with Sung to obtain "all technology required to manufacture the high quality, saw grade industrial diamonds." (Tr.Ex.Y1). The evidence presented at trial indicates that Iljin got what they bargained for. The stolen documents contained in Exhibit A provided a veritable blueprint description of GE's saw grade diamond process, a process that took GE over twenty years to develop. Moreover, the evidence indicates that the documents in Exhibit A describe a unique and highly profitable saw grade diamond operation that, prior to Iljin's misappropriation, put GE into a small, elite group of companies capable of producing high-grade saw diamond on a commercial scale. At the time of Iljin's misappropriation, only GE and DeBeers were producing and selling high-grade saw diamond on a commercial scale. Eventually, Tomei and Winter achieved the capability of competing with the forerunners, but the technological advances of all four companies—from the production of grinding diamond to low-grade saw diamond and finally to high-grade saw diamond—was a costly, laborious, twenty-year process.

Shin admitted at trial that, at the time they acquired GE's trade secrets from Sung in 1988, Iljin had neither manufactured nor developed a commercial process for producing saw grade diamond. The evidence at trial indicates that without the GE trade secrets stolen by Sung, Iljin would not have been able to manufacture *any* saw grade diamond, let alone commercially salable saw grade diamond. By use of the stolen GE trade secrets, Iljin was able to produce in two years what it had taken GE and its few legitimate competitors twenty years to produce.

This Court concludes that Iljin's production of saw grade diamond was inextricably connected to the technology found by the jury to be GE trade secrets and that Iljin's saw grade diamond process was entirely dependent upon that misappropriated technology. Under these circumstances, a production injunction is warranted. *See Head Ski Co.*, 158 F.Supp. at 924 (production injunction imposed because "defendants' entire operation had been built upon plaintiff's techniques, methods, materials and design").

### C. *Duration of Injunction*

■ The appropriate measure for determining the duration of the production injunction in this case is the amount of time it would have taken Iljin independently to develop or reverse engineer a technology for commercial production of high-grade saw diamond. *Lamb–Weston, Inc. v. McCain Foods, Ltd.*, 941 F.2d 970, 974 (9th Cir.1991); *Eastern Marble Products*, 372 Mass. at 842–43, 364 N.E.2d 799. Because it is both logical and within the discretion of the Court that a production injunction run from the date of the Court's Order rather than from the date of misappropriation, it shall be so imposed in this case. *See Viscofan*, 787 F.2d at 551; *Rockwell Graphic Systems*, 1993 WL 286484, at *5–6.

■ GE argues that it would have taken Iljin a minimum of ten years to produce

independently a commercially viable, high-grade saw diamond technology. Iljin, on the other hand, contends that they could have independently produced such a technology in three years. Based upon the evidence presented at trial, and affidavits submitted since the trial, this Court concludes that it would have taken Iljin a minimum of seven years to develop independently a commercially viable, high-grade saw diamond technology.

It took GE, DeBeers, Tomei and Winter (the first four companies to produce high-grade saw diamond on a commercial scale) more than twenty years to progress through the stages of manufacturing grinding diamond and low-grade saw diamond to the ultimate manufacture and sale of high-grade saw diamond. Prior to the time Iljin received the stolen GE trade secrets, they had no commercial process for the production of any saw grade diamond. After acquiring the GE technology in 1988, Iljin was able to produce all three grades of diamond by 1990.

In determining that a seven-year production injunction is appropriate, the Court has taken into account the technological advances that have occurred and come into the public domain during the interceding decades since GE and its competitors began developing the technology. In the Court's view, those advances indicate that GE's proposed ten-year ban is too long. At the same time, this Court is mindful of the fact that Iljin was a willful, rather than innocent, wrongdoer. Iljin made a calculated decision to circumvent the expensive and difficult process of developing their own saw grade diamond technology by purchasing stolen GE trade secrets. *See National Football League Properties, Inc. v. Wichita Falls Sportswear, Inc.*, 532 F.Supp. 651, 664 (W.D.Wash.1982) (more restrictive injunction is appropriate against willful infringer than an innocent one in trademark infringement context).

By enjoining Iljin from the manufacture of saw grade diamond for seven years, this Court intends to promote the policies underlying trade secret protection by 1) reversing the headstart that Iljin achieved at GE's expense, 2) depriving Iljin of the advantages of their wrongdoing and 3) placing GE in the same position it would have occupied had Iljin not misappropriated its trade secrets. The injunction also should encourage commercial morality by its deterrent effect.

For the duration of the injunction, Iljin is free to conduct research on any diamond technology and to manufacture and sell diamond products other than saw grade diamond. Iljin may, however, with leave of Court and under appropriate conditions, license from another manufacturer technology or equipment to produce and sell saw grade diamond.

## III. Conclusion

For the foregoing reasons, plaintiff's motion for injunctive relief is hereby ALLOWED, in part. A production injunction for seven years, as more fully described in the Order entered herewith, will become effective upon the entry of that Order.

*ORDER FOR INJUNCTIVE RELIEF*

General Electric Company ("GE") commenced this action against Iljin Corporation, Iljin Diamond Manufacturing Company and Chin–Kyu Huh (collectively, "Iljin") for, *inter alia*, misappropriation of trade secrets. The action was tried to a jury in July, 1993, and a verdict was returned for GE and against Iljin for misappropriation of GE trade secrets. In view of the jury's findings and the reasoning contained in the Memorandum of Decision of even date injunctive relief is warranted.

Therefore, it is hereby ordered, adjudged and decreed that:

### I. *Definitions*

Unless otherwise provided, the terms listed below shall have the meanings ascribed herein:

1. "GE" shall mean the General Electric Company.

2. "Iljin" shall mean Iljin Corporation, Iljin Diamond Manufacturing Company and Chin–Kyu Huh, individually and collectively, and all of their employees, agents and others acting under their direction and control.

3. "Parties" shall mean the plaintiff and the defendants, collectively and individually.

4. "Trade Secret" shall have the meaning ascribed under Massachusetts law.

5. "GE Trade Secrets" shall mean, in addition to the meaning set forth in paragraph 4:

(A) each document contained in Trial Exhibit A, and

(B) any document, equipment or other tangible thing copied or substantially derived, directly or indirectly, from any document in Trial Exhibit A.

6. "Document" shall include writings, drawings, specifications, instructions, graphs, charts, photographs, records, audio and video tapes, computer software, computer databases and other data or information compilations from which information can be obtained, translated or extracted.

7. "Saw Grade Diamond Product" shall mean any diamond of sufficient size and toughness to be used on a saw blade or similar device for the purposes of cutting hard materials.

## II. *Parties to this Injunction*

8. The provisions of this Order shall be binding upon and applicable to the Parties and their officers, directors, employees, agents, predecessors or successors in interest, assigns and all other persons or entities in active concert or participation with the Parties who have actual notice of this injunction.

## III. *Injunction*

9. Within thirty (30) days of the entry of this Order, Iljin shall collect and cause to be destroyed or returned to GE all originals and all copies of all documents, equipment and other tangible items in the possession, custody or control of Iljin which comprise, in whole or in part, any GE trade secret, including, without limitation, all documents in Trial Exhibit A, all translations thereof and all drawings of and equipment constituting all or part of the S–1000, M–3000, L–5000, IJ–40, IJ–75, IJ–80 and IJ–77 apparatuses and reaction cell designs.

10. Within thirty (30) days of the entry of this Order, Iljin shall file with the Court and provide to GE an affidavit certifying Iljin's compliance with the terms of paragraph 9.

11. For a period of seven (7) years from the effective date of this Order ("the Injunction Period"), Iljin shall be, and hereby is, enjoined from participating, directly or indirectly, or assisting any third party, directly or indirectly, in the manufacture for sale of any Saw Grade Diamond Product.

12. Iljin shall have the right, during the Injunction Period, to petition this Court for leave to license from another manufacturer the technology or equipment for manufacturing Saw Grade Diamond Product.

13. In the event that Iljin fails to comply with paragraph 11 of this Order, the Injunction Period set forth in that paragraph shall be tolled until such time as Iljin is in full and complete compliance with that paragraph.

## IV. *Auditing*

14. GE shall have the right to appoint an independent auditor who is not associated or affiliated with any competitor of Iljin and who shall be permitted, at GE's expense, to inspect the premises, books and records of Iljin at reasonable times and intervals during the first year of the Injunction Period and annually during the remainder of the Injunction Period. The auditor shall make no report to any party unless the auditor determines that Iljin is not in compliance with this Order. In the event that the auditor determines that Iljin is not in compliance with any or all of the terms of this Order, the auditor shall submit a report to GE and Iljin setting forth the nature and evidence of such noncompliance.

## V. *Effective Date*

15. This Order shall become effective on the date it is entered by the Clerk of this Court.

So Ordered.