Wilkins, Douglas H., J.
Plaintiff, ISO Claims Partners, Inc. (“ISO”), brought an action for injunctive relief and damages against the defendant Martin Cassavoy (“Cassavoy”). In particular, ISO claims that Cassavoy has breached and will breach restrictive covenants contained in his Employment Agreement dated December 9, 2010, prohibiting competitive employment, disclosure and use of confidential information and solicitation of ISO’s clients. The court heard argument from both sides on March 15, 2017 on ISO’s “Emergency Motion for a Preliminary Injunction” (“Motion”). For the reasons set forth below, the Motion is ALLOWED WITH CONDITIONS.
BACKGROUND
At this early stage, the court makes the following preliminary findings of fact, reflecting those facts that ISO is likely to prove.
Martin Cassavoy (“Cassavoy”) was Vice President, Policy for ISO. He began working for Crowe Paradis, a predecessor of ISO, on March 20, 2006. On December 9, 2010, after being promoted to Vice President of Policy, Cassavoy signed the Crowe Paradis Services Corporation’s Confidentiality and Non-Competition Agreement (“Agreement”). Crowe Paradis was acquired by ISO’s parent, Verisk Analytics on December 14, 2010, and later changed its name to ISO Claims Partners, Inc., effective January 1, 2014.
The “Confidentiality and Non-Competition Agreement” (“Agreement”) contained the following provisions, among others:
1. Non-Disclosure of Confidential Information. Employee hereby agrees to receive and to hold in trust and confidence during and after Employee’s employment with the Company, regardless of whether such information is in Employee’s memory or in ■written or recorded form. For purposes of this Agreement, “Confidential Information” includes, without limitation, all intellectual property, trade secrets, confidential information, proprietary information, customer lists (whether created by the Company or not), information about customers or potential customers, business cards or other contact information for customers or potential customers, vendor lists (whether created by the Company or not), information about vendors or potential vendors, business cards or other contact information for customers or potential vendors, lists of employees (whether created by the Company or not), information about employee, product development, marketing, research, products, processes, operations, computer programs and documents, pricing, costs, financials, accounting information, business policies or practices and similar information or other information pertaining to the Company and its business. Employee also agrees to (i) use its best efforts to safeguard Confidential Information at all times so that it is not exposed to, used by, or made available to any persons without the prior written consent of the Company, and (ii) not to cause or influence any person, business or entiiy to disclose, divulge, or make unauthorized use of any Confidential information.
[[Image here]]
4. Fair Competition After Termination. To protect the Confidential Information, the Company’s client relationships and goodwill, and the Company’s other business interests, all of which Employee agrees are legitimate business interests of the Company, and in consideration of the mutual promises set forth herein, Employee agrees that during the term of its employment with the Company and for a period of one (1) year following Employee’s termination from the Company for any reason, Employee will not directly or indirectly do any of the following, whether as an individual, employee, agent, shareholder, or partner of any person, business or entity, in the United States:
A. Work, participate in, or otherwise be involved in any business activity that competes directly or indirectly with the products or services being developed, manufactured or sold by the Company, including without limitation, any other services that Company offered during the term of Employee’s employment with the Company within the three (3) year period preceding Employee’s termination from the Company; or
B. Solicit, pursue, accept, participate in, or otherwise be involved in any business activity that competes directly or indirectly -with the products or services being developed, manufactured or sold by the Company, including without limitation, any other services that Company offered during the term of Employee’s employment with the Company within the three (3) year period preceding Employee’s termination from the Company; . . . [C.-E. omitted]
At ISO, Cassavoy worked on Medicare Secondary Payer (“MSP”) compliance. He has described his role as “work[ing] one-on-one with clients to serve their individual compliance needs” and “work[ing] with major national insurers to assist them in developing and implementing a compliance model.” He has said that he acts “as the business unit lead for all contract matters including negotiation, drafting and contract strategy.” He was a member of a 20-person group, including employees of various levels of responsibility, known as the “Senior Team.” While the parties disagree about whether he was responsible for “developing” products as such, he did, at least, assist ISO employees on applying MSP compliance concepts to the services and (in at least one case) products that *178 ISO provided. He has also stated “My diverse background includes experience in product development, marketing, management and public speaking.” He was the MSP compliance policy advisor prior to the development of the ISO product known as MSP Navigator. He otherwise lacks a technical background relating to development or upgrades of operating systems. He was responsible for responding to RFPs, as assigned by the ISO Business operations department. At times, he was consulted about the price of offerings, specific products offered and the development of additional products and services for the client. On a daily basis, he often answered MSP compliance-related questions for the decision makers at clients and for others needing assistance. While he spoke and wrote on topics related to MSP compliance, ISO also eliminated his name as author in some instances. His salary, including salary, bonuses and equity compensation grants, exceeded $200,000.
As Vice President, Policy, Cassavoy had knowledge of ISO’s sales activities, customer relations issues, sales prospects and corporate strategies, including plans for submissions in response to customers’ requests for proposals. He knew confidential aspects of ISO’s current and future technical capabilities and processes. He had extensive client contact, including several major insurance companies who were ISO’s clients. The identity of those well-known companies and their need for MSP compliance services, of course, is no secret.
On January 25, 2017, at Barr’s specific direction, Cassavoy requested a meeting with Amanda Smith to get a deeper understanding of how “system to system” clients would be affected by an ongoing ISO product development project. Shortly before Cassavoy resigned (January 27 at 2 pm), he attended a meeting that Caitlin Henry had previously scheduled with ISO project managers. Cassavoy was not a typical attendee at that meeting. At the meeting, he asked about how “system to system” clients would be affected by an ongoing ISO product development project. He said “if I were to reach out to [two specifically identified clients], I need to understand what I will be able to tell them about the options available to them.” The project manager answered the question and sent a summary email immediately after the meeting. This information qualifies as confidential business information. Disclosure to ISO’s competitors would cause irreparable injury, particularly where there is an ongoing RFP process involving one or two of those clients.
Given Cassavoy’s resignation on January 27, the Court does not at this time credit Cassavoy’s assertion (Aff. ¶1 l.b) that the meeting that very same day “was important for me in my role of responding to the Allstate RFP.” He knew that he was going to end any such role immediately.
On Friday, January 27, 2017, Cassavoy asked Assistant Vice President, Human Resources, Amanda Gilbert, if she would be available for a brief meeting it the end of the day. At about 4:15 that day, he went to Ms. Gilbert’s office and said that he was giving his two weeks’ notice. At Ms. Gilbert’s request, he sent a resignation email, attaching a list of ongoing projects, to Chief Operating Officer Carrie Barr at 4:22 P.M. He spoke to Ms. Barr by phone at about 4:30 and, because he could not confirm that he was not joining a competitor, was told to leave ISO right away. Cassavoy’s employment with ISO terminated effective Monday, January 30, 2017.
ISO performed a forensic examination of Cassavoy’s work laptop and discovered a 10-page document in the “recently accessed document file” that contained a list of contact information of decision-makers at numerous Claims Partners’ clients. It appeared to be cut and pasted from a spread sheet of all high-profile clients of Claims partners, including new clients. It was recently created. Certainly, Cassavoy might remember portions of the list. However, given the generality of the complaint — and the obviousness of the information mentioned during the hearing that certain named insurers were ISO’s clients — the Court is not persuaded that a memory of some names of decision-makers at these large, well-known companies qualify as confidential information. While ISO invested resources in creating the list itself (and alleges that it “costs thousands of dollars and a significant number of work hours to obtain”), it has no proof that Cassavoy took the list or any other document or electronic file with him.
A review of Cassavoy’s emails and calendar led to the inference that he travelled to Atlanta, Georgia on December 15, 2016. ExamWorks has its headquarters in Atlanta. It is not clear whether there is a connection between these facts.
On February 13, 2017, Cassavoy began work for ExamWorks Group, Inc. (“ExamWorks”), as Vice President of MSP Compliance. He describes his role as (1) acting as a resource for employees and management regarding MSP Act and its ramifications on medicare compliance, and (2) overseeing the Compliance Department and assisting its two employees in understanding the MSP statute and applying it in individual cases. ExamWorks provides Medicare Compliance and claims analytic services. It therefore is a competitor of ISO.
Two of ISO’s major clients (Liberty Mutual and Allstate) have Requests for Proposal outstanding or soon-to-issue. Mr. Cassavoy was fully informed about ISO’s confidential strategies to retain those customers. He has not had any communications with any of his five major insurance company clients since leaving ISO. Exam Works, however, appears to be a natural candidate to respond to the RFPs.
DISCUSSION
A party seeking a preliminary injunction must prove a likelihood of success on the merits of the case *179 and a balance of harm in its favor when considered in light of the likelihood of success. Packaging Indus. Group, Inc. v. Cheney, 380 Mass. 609, 616-17 (1980). “One... is not entitled to seek [injunctive] relief unless the apprehended danger is so near as at least to be reasonably imminent.” Shaw v. Harding, 306 Mass. 441, 449-50 (1940).
I.
ISO has shown that it is likely to succeed on its claims to enforce the covenant as to non-competition, non-solicitation of customers and employees, as well as non-use of confidential information.
In general, an employer may enforce a non-competition agreement with a former employee upon proof that the agreement (a) is necessary to protect the employer’s legitimate business interest, (b) is supported by consideration, (c) is reasonably limited in all circumstances, including time and space, and (d) is otherwise consonant with public policy. Marine Contractors Co. v. Hurley, 365 Mass. 280, 286-88 (1974). See also Whitinsville Plaza, Inc. v. Kotseas, 378 Mass. 85, 102-03 (1979), and cases cited.
A. Employer Business Interest
Non-competition agreements are only enforceable “to the extent that they are necessary to protect the legitimate business interests of the employer.” Marine Contractors, 365 Mass. at 287, citing Novelty Bias Binding Co. v. Shevrin, 342 Mass. 714, 716 (1961). Edwards v. Athena Capital Advisors, Inc., No. 072418E, 2007 WL 2840360 (Super.Ct. Aug. 9, 2007) [23 Mass. L. Rptr. 155]. Legitimate business interests include protection of trade secrets, confidential information and the good will it has established with its customers. Boulanger v. Dunkin’ Donuts Incorporated, 442 Mass. 635, 641 (2004). See All Stainless. Inc., 364 Mass, at 779-80. Legitimate business interests do not include, however, protection from ordinary competition. Richmond Bros., Inc. v. Westinghouse Broad. Co., 357 Mass. 106, 111 (1970); Marine Contractors, 365 Mass. at 288.
i. Confidential Information
It is well-settled “that an employee upon terminating his employment may carry away and use the general skill or knowledge acquired during the course of the employment.” Dynamics Research Corp. v. Analytic Sciences Corp., 9 Mass.App.Ct. 254, 267 (1980), citing Junker v. Plummer, 320 Mass. 76, 79 (1946). See Jet Spray Cooler, Inc. v. Crampton, 361 Mass. 835, 839 (1972). Public policy favors an employee’s right to move from job to job unencumbered by restrictions that are not narrowly tailored to protect an employer’s legitimate interests. Club Aluminum Co. v. Young, 263 Mass. 223, 225 (1928).
Edwards, supra. Confidential information protectible by a non-compete need not rise to the level of a trade secret. See Warner-Lambert Company v. Execuquest Corporation 427 Mass. 46, 49 n.5 (1998); USM Corp. v. Marson Fastener Corp., 379 Mass. 90, 104, S.C. 392 Mass. 334 (1984). C.R. Bard, Inc. v. Intoccia, 1994 WL 601944 (D.Mass. 1994) at *3 (“Bard expended substantial monies and effort and, as noted earlier, its technical and design decisions reflect its learning about market needs and conditions. This is confidential information even though it does not represent a major scientific breakthrough or, in a technical sense, a trade secret”). Here, ISO took a number of steps to protect its confidential information. See Jet Spray Cooler, Inc. v. Crampton, 361 Mass. 835, 841 (1972). Under these tests, ISO’s two confidential information claims lead to different results in this case.
Cassavoy’s memory of decision-maker contacts likely qualifies as “general skill or knowledge.” Otherwise, an employee would be restricted from employment in his or her field simply by reason of knowing the public facts known generally by people in the industry. ISO makes no claim that the information about decision-makers at its clients is in any sense secret; it just claims that it would take time and money to learn those names. Cf. Jet Spray Cooler, 361 Mass. 840 (Among the six factors defining confidential information are “(1) the extent to which the information is known outside of the business; . . . the amount of effort or money expended by the employer in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others”). To the extent that Cassavoy may remember who works for what company, he merely knows non-confidential information that people outside ISO in the industry know or can readily learn by inquiring of well-known companies. His general knowledge, contained in his memory, stands in contrast to ISO’s actual compilation of the list of names.
If compiled from a confidential source, the list of names, referred to as “Kathleen.doc” probably does qualify confidential information, rather than as “general knowledge” (although, in context, “thousands of dollars” may not be much money and “a significant number of work hours” is too vague to warrant much weight), but there is no evidence that Cassavoy took the list itself. The record reflects a dispute as to the source, which cannot be resolved easily at this point, because the Court and Cassavoy do not have access to the list; indeed, Cassavoy must make assumptions as to what the list shows, because he cannot access his former email or computer file. If Cassavoy is correct that he compiled a document from the so-called “Advanced Sending List” then he is probably also correct that ISO failed to take steps to protect that information, which was widely available to ISO employees generally without password protection.
In an affidavit filed two days after the hearing, ISO describes the list as containing not only the decision-makers at clients, but specifically those customers *180 who used ISO’s “MSP Navigator product for Section Ill reporting.” A list of that sort would not be known outside the business and would likely qualify as confidential information, because it appears that ISO did take steps to guard this information. The post-hearing affidavit also attempts to refute Cassavoy’s contention that he created the list out of the Advanced Sending List for sending newsletters and other communications, as opposed to the restricted list of MSP Navigator customers. It is not clear what ISO means by saying that Cassavoy’s list “does not match the Advanced Sending List in any respect.” That issue remains for trial, because it is not necessary to resolve the confidentiality of the list, as long as the non-compete protects other confidential information.
In any event, ISO has proven Cassavoy’s knowledge of other significant information that was “confidential” within the meaning of Jet Spray, particularly regarding the specific initiatives underway at ISO, as disclosed to him upon his specific request shortly before his departure. It appears that Cassavoy was planning his departure for some time. There appears to have been no need for his inquiry into these matters just before his departure. The timing of his inquiry, and the disclosure of information to him in response, leads to the inference for preliminary injunction purposes, that the information would be useful to him and his new employer — and that he intended to use it. If that was not his intention, as an employee acting in good faith and trained in the law, he would likely have steered clear of confidential information that might be used by his new employer.
Importantly where prospective clients are concerned, Cassavoy had access to ISO’s confidential strategic information and business plan. See Alexander, 21 Mass.App.Ct. at 498 (“not unreasonable to include prospective customers”). “[W]orking for a competitor of [ISO] makes it likely that the information [Cassavoy] possesses will be used, yet it might be impossible to detect or prove.” Boulanger, 442 Mass. at 642 n. 12. ISO has a legitimate interest in avoiding use of that information by a former employee.
ii. Good Will
ISO also has a legitimate business interest in protecting the good will derived from each of its customers. See All Stainless, Inc., 364 Mass. at 487 (“Our cases have generally not limited the enforcement of a . . . restrictive covenant so as only to bar sales (a) to persons formerly solicited by the salesman ... or (b) to those to whom sales were in fact made . . . [by] the salesman”). Protectable good will consists of the benefits that a business enjoys from its positive reputation with its customers, gained through continued business dealings, which enable it to retain the customer and obtain new business. Marine Contractors, 365 Mass, at 287-88. Alexander & Alexander, Inc. v. Danahy, 21 Mass.App.Ct. 488, 497 (1985). See also Kroe-ger v. Stop & Shop Cos. 13 Mass.App.Ct. 310, 316 (1982), citing Angier v. Webber, 14 Allen 211, 215 (1867) (“good will described as benefit derived from reputation for promptness, fidelity and integrity with customers”). “A court must consider, however, based on the facts of the particular case, whether the good will in issue belongs to the employer or to the employee.” Hilb Rogal & Hobbs of Mass, LLC v. Sheppard, Suffolk Superor Civil No. 07-5549-BE52, 2007 WL 5390399 (Mass.Super.Ct. 2007) (Fabricant, J.) [24 Mass. L. Rptr. 381]. “The objective of a reasonable noncompetition clause is to protect the employer’s good will, not to appropriate the good will of the employee.” Sentry Ins. v. Firnstein, 14 Mass.App.Ct. 706, 708 (1982).
It is not entirely clear how a non-compete is necessary to prevent Cassavoy from injuring ISO’s good will, at least if he refrains from soliciting customers. For one thing, it does not appear that he was personally involved in sales, as opposed to rendering services to ISO’s clients. Cf. Kroeger, 13 Mass.App.Ct. at 316 (“[S]alesmen . . . have the capacity to injure the good will of their former employers”). For another, it appears that the products of ISO and its competitors are distinct and involve different programs with different features, marketed to sophisticated customers in the MSP field, making it hard for a customer to confuse Cassavoy with ISO with respect to the products. See also All Stainless, Inc., 364 Mass. at 486 (“[F]ormer employee’s close association with the employer’s customers may cause those customers to associate the former employee, and not the employer, with products of the type sold to the customer through the efforts of the former employee,” and may damage the employer’s good will). Product development certainly plays a major role (which is why truly confidential information must be protected), but it is not clear how good will, as such, plays the kind of role that Cassavoy could damage at this point.
Even if good will did play that role, then, at best, Cassavoy’s and ISO’s good will are somewhat intertwined. See generally Getman v. USI Holdings Corp., 19 Mass. L. Rptr. 679, 681 (Super.Ct. Oct. 3, 2005). Cassavoy could not maintain a positive relationship with the customers unless other ISO employees did their job; he was not the person to do maintenance or other tasks outside his job description. He is not entitled to take sole credit for the ISO team’s product. Cassavoy’s services were thus ISO’s “product.” See id. at 681. On the other hand, to the extent that good will arose from Cassavoy’s contribution of his unique talents, abilities, experience or capacity for insight, those characteristics belonged to Cassavoy. Customers should not be deprived of their ability, as they may choose, to take advantage of his abilities, training, knowledge and experience. For ISO to deprive customers of those benefits would be to appropriate Cassavoy’s own good will.
*181 Because the Court enters a preliminary injunction based upon ISO’s interest in preserving confidential information, it is not necessary to rely upon protection of good will. However, the good will question illustrates the need to tailor any injunction to avoid over-reaching and harm to innocent third parties interested in ben-efitting from Mr. Cassavoy’s skill.
iii.Non-Solicitation
Although “the difference between accepting and receiving business, on the one hand, and indirectly soliciting on the other, maybe more metaphysical than real,” Alexander, 21 Mass.App.Ct. at 499, an injunction against solicitation at least ensures that the customer has made a choice that in no way depends upon breach of the Non-Compete. By contrast, an injunction barring Cassavoy from accepting business would deprive him of any good will he earned and would prevent ISO’s customers from freely choosing their vendor. Cassavoy’s ability to accept unsolicited work from any current ISO client fully protects his interest in light of the Agreement he signed. See Alexander & Alexander, Inc. v. Danahy, 21 Mass.App.Ct. 488, 499 (1986).
iv.Consideration
In Massachusetts continued employment is sufficient consideration to enforce a non-competition agreement. See Smith v. Graham Refrigeration Prods. Co., Inc., 333 Mass. 181, 186 (1955), citing Patton v. Babson’s Statistical Org., Inc., 259 Mass. 424, 427 (1927) (“[C]ontinued employment . . . (is) sufficient consideration to render the [non-compete] agreement enforceable”); Homer v. Boston Edison Co., 45 Mass.App.Ct. 139, 143 (1998) (continued employment constitutes sufficient consideration for a release of claims).
v. Employment as an Attorney
While Cassavoy is an attorney, licensed in Massachusetts, he has not shown that his work for ExamW-orks includes the practice of law. Limiting the practice of an attorney through a non-compete or otherwise would have to comply with SJC Rule 3:07, Mass.R.Prof. Conduct §5.6 (“A lawyer shall not participate in offering or making: (a) a[n] .. . agreement that restricts the right of a lawyer to practice after termination of the relationship, except an agreement concerning benefits upon retirement”). It does not matter whether Cassavoy worked in a non-legal capacity at ISO; the question is the “right of a lawyer to practice after termination” — i.e. with a new employer or in his own practice. At this stage of the proceedings, no violation of Rule 5.6 appears relevant to the facts presented on the Motion, but nothing in the Court’s injunction enforcing the non-compete provision should be read to limit Cassavoy in the practice of law.
vi. Public Interest and Duration
There are competing public interests at issue. ISO has an interest in protecting its goodwill and Cassavoy has an interest in gainful employment and in maintaining his own good will. As illustrated by affidavits in this case, potential customers also have an interest in using Cassavoy’s skills, rather than having him sidelined in situations where he could help them. Those potential customers are not, of course parties, but they could be innocent victims of an overbroad or inappropriate injunction. “[T]he public and the individual have an interest in every person carrying on his trade or occupation freely. Interference with individual liberty of trade, if there is nothing more, is contrary to public policy . ..” Edwards v. Athena Capital Advisors, Inc., Civil No. 072418E, 2007 WL 2840360 (Super.Ct. Aug. 9, 2007) [23 Mass. L. Rptr. 155], quoting Woolley’s Laundry v. Silva, 304 Mass. 383, 387 (1939).
Where the employer’s interests do not, on the facts, justify a total infringement on the right to employment and open competition, the public interest weighs against full enforcement of the non-compete provision of the Employment Agreement. Here, the public interest is likely to favor enforcing ISO’s Agreement at least to an extent.
To be enforceable, in whole or in part, a non-compete agreement must be reasonable in terms of time. All Stainless, Inc., 364 Mass. at 779. See Philips Electronics 631 F.Sup.2d at 717. In determining whether a non-compete agreement is reasonable, a court must consider, “the nature of the plaintiffs business and the character of the employment involved, as well as the situation of the parties, the necessity of the restriction for the protection of the employer’s business and the right of the employee to work and earn a livelihood." Richmond Bros., Inc., 357 Mass. at 110, citing Club Aluminum Co. v. Young, 263 Mass. 223, 226-27 (1928).
To decide whether ISO’s Employment Agreement was overbroad, the court must consider several factors bearing upon whether ISO needed the one-year time restriction to protect its legitimate business interest. See Richmond Bros., Inc., 357 Mass. at 110. The time restriction is not per se unreasonable. See, e.g., Alexander, 21 Mass.App.Ct. at 498 (five years not unreasonable period for covenant). An otherwise overbroad restriction can be enforced to the extent that it is reasonable. See All Stainless, Inc. v. Colby, 364 Mass. 773, 777 (1974) (“We hold . . . that the restrictive covenant should have been enforced to the extent it was reasonable . . .”). Moreover, at least some of the obligations in the Agreement already exist under the common law. See Eastern Marble Products Corp. v. Roman Marble, Inc., 372 Mass. 835 (1977), citing Restatement (Second) of Agency, §396 (1958). See also Chelsea Industries, Inc. v. Gaffney, 389 Mass. 1 (1983); TalentBurst, Inc. v. Collabera, Inc., 567 F.Sup.2d 261, 266 (D.Mass. 2008).
There is very little in the record that would help the Court determine whether the full year non-competition restriction is necessary to protect ISO’s legitimate interests. The pendency of one RFP and imminent release of another establishes the reasonableness of ISO’s interests in the medium term, i.e. six months. The record does not show (and it may be impossible to know) *182 when those two RFP processes will result in a contract between the insurers and a MSP provider. It does appear that the other three large insurers are under contract with ISO for a period that extends beyond expiration of the one-year noncompete. There is no evidence about potential harm to ISO’s relationship with any other customers if Cassavoy works for a competitor.
The Court also has serious questions at this point whether any of the information to which Cassavoy had access will retain any value after six months. That is not necessarily fatal, at the preliminary injunction stage, because the court may reach the merits well before the maximum time contemplated in the Agreement. Still, given the dynamic nature of many highly technical markets, of which this maybe one, information can easily become stale quickly. See Cassavoy Aff. ¶14 (“Because of the nature of federal policy in this area, the MSP industry is constantly changing from month to month”). It is unlikely that the use of stale information would harm ISO. The Court is not convinced that ISO has a likelihood of success in proving that information that is nearly ayear old would provide a meaningful competitive advantage. Without such a showing, the Court should not automatically enforce a year-long restriction, because that would merely serve to sideline a competitor who may have useful and legitimate contributions to make.
The fair balance, for preliminary injunction purposes, is entirely consistent with at least a six-month non-compete restriction — and perhaps ultimately the full year— in light of Cassavoy’s activities immediately before his termination, which suggest the potential for harm to ISO, at least in connection with pending RFPs and other medium-term competitive activities. See Simplivity Corporation v. Bondranko, 2016 WL 4579121 (D.Mass. 2016), appeal pending (reducing one-year restriction to sixyears). See, 442 Mass, at 643 (two-year limitation not unreasonable); All Stainless, Inc., 364 Mass. at 777 (same); Cf. Getman at 681-82 (three-year anti-solicitation provision was unreasonable, where the former employee was not represented by counsel nor did he negotiate with employer before signing non-compete agreement). This restriction will give ISO ample protection of its goodwill but will not necessarily last so long that it protects ISO from ordinaiy competition or misappropriates Cassavoy’s good will. The Court expects the parties to work on a schedule to resolve the matter, or complete a trial on the merits, by then. If they fail to do so, the Court will entertain a motion to extend the preliminary injunction, upon a showing that a full year non-compete is necessary and appropriate to protect ISO’s interests.
The no-solicitation restriction is less burdensome upon Cassavoy and upon customers who may seek him out to perform services. Indeed, it would almost completely protect ISO against any client contact information in Cassavoy’s memory and would even protect against the as-yet-unproven insinuation that Cassavoy might have taken the list itself. While a one-year duration of the ban on solicitation is therefore more likely to be upheld, the Court will consider that question if the need for extension beyond the six-month period arises.
II.
In light of ISO’s likelihood of success, the balance of harms weighs in its favor. A business relationship, once destroyed, cannot easily be restored. No one can know what ISO might have earned if those relationships continued. While it may be possible to estimate some of the money damages, there is a great deal of uncertainly in doing even that. Some of the damage is likely unprovable. The only way to protect ISO’s full interests under the Agreement is to enter an injunction.
Since there is no proof that Cassavoy actually took confidential information from ISO, ISO is not likely to succeed on that point. Obviously, if he did take such information it must be returned. The Court can enter no injunction on that point without a finding of likelihood of success. Therefore, that request for relief is denied.
ORDER
For the foregoing reasons, it is ORDERED AND ADJUDGED THAT:
1. The following preliminary injunction shall be in effect until (a) the case is resolved on the merits or (b) July 30, 2017, whichever comes first, such that Cassavoy will not, directly or indirectly, on his own behalf or as an employee, associate, or co-owner:
(i) Work, participate in, or otherwise be involved in any business activity that competes directly or indirectly with the products or services being developed, manufactured or sold by the Company, including without limitation, any other services that Company offered during the term of Employee’s employment with the Company within the three (3) year period preceding Employee’s termination from the Company; or
(ii) Solicit, pursue, accept, participate in, or otherwise be involved in any business activity that competes directly or indirectly with the products or services being developed, manufactured or sold by the Company, including without limitation, any other services that Company offered during the term of Employee’s employment with the Company within the three (3) year period preceding Employee’s termination from the Company.
2. The parties shall consult upon a schedule that would either resolve their dispute, or bring this matter to trial on the merits by July 30, 2017. If they are not successful in developing a joint schedule by April 18, 2017, they each side shall file a proposed schedule, and either side may move to extend or terminate this order.