van Gestel, J.
This matter came before the Court ear her on a motion by the defendants Staples, Inc. and Staples Contract and Commercial, Inc. (collectively “Staples”) seeking preliminary injunctive relief. The Court then began to evaluate Staples’s claims of irreparable injury and chance of success on the merits and balance these claims against similar risks of irreparable harm which granting the injunctions might create for the corporate plaintiff W.B. Mason Co., Inc. (“W.B. Mason”) and the individual plaintiffs. Packaging Indus. Group, Inc. v. Cheney, 380 Mass. 609, 617 (1980).
Because of the intensity of the commercial conflict between the two principals involved — Staples and W.B. Mason — the Corut initially concluded that neither fairness nor equity could be assured for either side on a record presented only on the traditional basis of pleadings, affidavits and oral argument. Consequently, the Court exercised the authority granted to it by Mass.R.Civ.P. Rule 65(b)(2) and ordered the trial of this action on the merits to be advanced and consolidated with the hearing on the application for preliminary injunctions. See, e.g., M.D.C. v. Codex Corp., 395 Mass. 522, 524 (1985); Packaging Indus. Group, Inc., supra, 380 Mass. at 616 n.10; Carabetta Enterprises, Inc. v. Schena, 25 Mass.App.Ct. 389, 392 n.1 (1988).
After issuing its order for a consolidated hearing, there were further communications with counsel for all sides. Counsel and their clients indicated their preference to have a relatively rapid hearing on the preliminary injunction issues and a trial on the remainder of the merits issues at a later date. Acceding to counsels’ requests, the Court then set a date for a limited evidentiary hearing focused solely on those issues related to the requested injunctive relief. A period of heavy discovery followed, including documentary production and depositions by all sides. Thereafter, commencing on January 8, 2001, the Court presided over a five-day, jury-waived evidentiary hearing. What follows are the Court’s findings, rulings and an order regarding Staples’s request for preliminary injunctions.

FINDINGS OF FACT

In New England and New York, W.B. Mason and Staples are intense business competitors in the sale of office supplies. The office supply business is not just the sale of pencils and paper clips. Both Staples and W.B. Mason sell over 30,000 products, including traditional office supplies, business and technology machines, office furniture, printed materials and a vast array of related products.
The individual plaintiffs, Harvey Feldman (“Feldman") and Robert Bartha (“Bartha”), were each sales employees of Staples who left to join W.B. Mason. While at Staples, Feldman was an Account Manager responsible for annualized gross sales of approximately $1.1 million for the year 2000, and Bartha was a Senior Account Manager responsible for approximately $1.6 million for the same period. Both Feldman and Bartha are college graduates, one having majored in economics and the other, in finance.-Both had extensive experience in the office supplies sales business before joining Staples in 1995. Feldman and Bartha each previously were office supplies sales employees of Arlo Office Products, Inc. (“Arlo”), a North Haven, Connecticut company acquired by Staples in November of 1995.
At the time of the Arlo acquisition, in connection with the start of their employment with Staples, Feldman and Bartha each executed identical “Proprietary and Confidential Information Agreement[s]” and ”Agreement[s] Not To Compete” — Feldman on “10/30/95" and Bartha on ’’November 1, 1995."
*604 For purposes here, the 1995 Confidential Information Agreements recite that Staples
possesses and will continue to possess information, goodwill and other assets that have been created or developed, or have otherwise become known to [Staples]. . . which information, goodwill and other assets have commercial value in the business in which [Staples] is engaged. All of the aforementioned information is hereinafter called “Proprietary Information.”
All Proprietary Information shall be the sole property of [Staples] and its assigns, and [Staples] and its assigns shall be the sole owner of all rights in connection therewith ... At all times, both during [Feldman’s and Bartha’s] employment by [Staples] and after its termination, [they] will keep in confidence and trust, and not use to the detriment of [Staples] or for the benefit of [themselves] or any third party, all Proprietary Information or anything related to it without the written consent of [Staples], except as may be necessary in the ordinary course of performing [their] duties as an employee of [Staples].
These agreements also contain acknowledgments that “in addition to any other rights and remedies available to [Staples] for any breach by [Feldman and Bartha] of [their] obligations hereunder, [Staples] shall be entitled to the enforcement of [their] obligations hereunder by court injunction.”
The Confidential Information Agreements are said to be governed in all respects by the laws of the Commonwealth of Massachusetts.
Again, for purposes here, the Non-Competition Agreements recite that •
For all periods beginning upon the date hereof and ending one year from the date of termination of his/her employment with [Staples] for whatever reason, [Feldman and Bartha] shall not directly or indirectly as owner, partner, joint venturer, stockholder, employee, broker, agent, principal, trustee, corporate officer, director, licensor, or in any capacity whatsoever engage in, become financially interested in, be employed by or have any connection with, any business engaged in the sale of office products in the Territory (as defined below); . . . For purposes hereof, the Territory shall mean the area within a 50 mile radius from the office (which, if Employee works primarily from Employee’s residence even if assigned to an office, shall mean such residence) where the Employee principally performs or performed services for [Staples] within the last two years or two years prior to termination of employment.
Both Feldman and Bartha, at the time that they left Staples, were employed in the Wallingford, Connecticut, office, although Bartha primarily worked from his home in East Hartford.
Each of the Non-Competition agreements, like the Confidential Information agreements, contains provisions granting to Staples the right to enforce them by injunctive relief, and providing that the law of Massachusetts shall govern.
After being engaged by Staples, Feldman and Bartha were provided with a considerable amount of sales training, including a comprehensive program called “the Staples’ Way.” This program included techniques for building customer relations, solicitation, mailings, presentations, follow-ups, as well as cultivating and maintaining selling opportunities with existing customers and developing new selling opportunities with prospective customers. The Staples’ Way training plan was basically a customized version of the openly published Sandler Selling System program. In the course of this program, and other similar training programs, employees like Feldman and Bartha are exposed to confidential strategies, forecasts, pricing policies and other business information. Sales personnel are provided with leads and customer lists. They also are trained in special pricing techniques and incentives.
In 1998, there was a prior history of Staples’s sales employees quitting abruptly and going to work at W.B. Mason. Large segments of Staples’s Rhode Island and Worcester offices were involved. Two law suits subsequently were spawned, and a settlement of sorts was achieved.
On July 7, 1999, Feldman, in connection with the granting by Staples of additional stock options, executed a new “Non-Compete and Non-Solicitation Agreement.” For purposes here, the 1999 agreement enlarged the Territory for the non-competition covenant from a 50- to a 100-mile radius from the Staples office. Bartha refused to sign this new agreement. Before Feldman executed his 1999 agreement, Staples’s chief executive officer issued a memorandum effectively modifying certain aspects of the non-competition agreements. The modification provides that if any employee is terminated by Staples, other than for cause, the non-competition agreement will not be enforced against that employee. Neither Feldman nor Bartha — nor, it seems, anyone else in the Connecticut office — was aware of this memorandum. Its significance here is of little moment, however, because both Feldman and Bartha resigned from Staples. Neither was terminated.
On Monday, November 13, 2000, without prior notice to Staples, both Feldman and Bartha resigned and immediately went to work for W.B. Mason in its nearby North Haven, Connecticut office that same day. These resignations were not spontaneous happenings; and W.B. Mason was well aware of the Confidential Information and Non-Competition Agreement that each man had with Staples. While there is ample evidence to establish this prior knowledge — including the fact that W.B. Mason so *605 licited Bartha and he, for It, solicited Feldman — the clearest example is that W.B. Mason filed this extensive complaint for declaratory relief from the obligations of the agreements on the same day that Feldman and Bartha quit Staples.
Before resigning from Staples on November 13, 2000, Feldman and Bartha were told by W.B. Mason to tell Staples that they “are resigning” and to “give them [Staples] no notice.” Additionally, they were expected to, and did, arrive at W.B. Mason’s North Haven, Connecticut office by 8:30 a.m. that same day. After arrival, they immediately began traveling about in their old Staples territories, meeting with their former Staples customers, advising them of their change in employment, introducing W.B. Mason people who accompanied them, and urging a transfer in the business from Staples to W.B. Mason.
Staples and W.B. Mason have vastly different sales philosophies and methods for conducting their businesses. Staples intensely trains its sales personnel and attempts to achieve a collaborative and consultative relationship between its sales personnel and its customers. It emphasizes that its “Account Managers” — the name it uses to describe its sales people — are not simply order-takers. W.B. Mason, in contrast, deploys its sales people more like peddlers, arming them with catalogues and sending them out, going door-to-door, hustling business.
It was clear that neither Feldman nor Bartha was interested in nor cut out for sales employment under the Staples’ Way. Each was much more comfortable with the W.B. Mason peddlers’ approach. While at Staples, Feldman and Bartha paid little more than lip service to Staples’s methods. Since joining W.B. Mason, they willingly follow the W.B. Mason peddler mode. The only thing Feldman and Bartha really carried with them from Staples was a knowledge of their former customers and, for the most part, an understanding of the persons amongst those customers who were the decision makers on the purchase of office supplies.
From the time that Feldman and Bartha signed their 1995 agreements, up through 1998, there were a number of changes in their work situation. Because of certain modifications by Staples, there were also some considerable problems, mostly in 1998, with a new computerized system dealing with ordering, delivery and returns of product. Also, Staples elected to centralize its customer service operations and personnel. Feldman and Bartha found that these changes interfered with their abilities to service their Connecticut customers.
The most significant change in their work situation, however, related to the method of compensation. Prior to the compensation change, which also came about in 1998, Feldman and Bartha had been compensated on a straight commission basis. The new plan was a combination of two components: a straight wage component and a variable component related to sales. Tied into this new plan was a compensation grid that measured the two elements of gross sales and gross profit. Feldman and Bartha complained that under this new plan they were required to work harder and had the potential of getting paid less.
Early indications — albeit unexplained — suggest that there may be some modest loss of business to a few of Staples’s customers formerly serviced by Feldman and Bartha. If those losses are related to Feldman and Bartha joining W.B. Mason, however, they do not appear to result from any use of things learned from the Staples’ Way training or other truly confidential information gained while in Staples’s employ. Rather, it probably comes from a limited attack on the Staples’s good will that Feldman and Bartha carried with them when they left.

RULINGS OF LAW

In order to prevail on its request for preliminary injunctive relief, Staples bears the burden of showing its likelihood of success on the merits: that it will suffer irreparable harm if the injunctive relief sought is not granted; and that its harm, without the injunctions, outweighs any harm to Feldman, Bartha and W.B. Mason, from their being enjoined. GTE Products Corp. v. Stewart, 414 Mass. 721, 722-23 (1993); Packaging Indus. Group, Inc., supra, 380 Mass. at 616-17. Before assaying these issues, it is appropriate to canvass the relevant elements of the Massachusetts law dealing with the enforcement of non-competition and confidentiality agreements.
Employee covenants not to compete generally are enforceable only to the extent that they are necessary to protect the legitimate business interests of the employer. Novelty Bias Binding Co. v. Shevrin, [342 Mass. 714, 716 (1961)]. Such legitimate business interests might include trade secrets, other confidential information, or, particularly relevant here, the good will the employer has acquired through dealings with his customers. See All Stainless, Inc. v. Colby, [364 Mass. 773, 779-80 (1974)]. Protection of the employer from ordinary competition, however, is not a legitimate business interest, and a covenant not to compete designed solely for that purpose will not be enforced. Richmond Bros, Inc. v. Westinghouse Bdcst. Co., Inc., 357 Mass. 106, 111 (1970).
Marine Contractors Co., Inc. v. Hurley, 365 Mass. 280, 287-88 [1974).
Good will is a broad term and encompasses a variety of intangible business attributes such as the “ ‘name, location and reputation, which tends to enable’ the business ‘to retain [its] patronage.’ ” Slate Co. v. Bikash, 343 Mass. 172, 175-76 (1961). An employer’s positive reputation or position in the eyes of its customers or potential customers is an element of good will. Marine Contractors Co., Inc., supra, 365 *606 Mass. at 287-89. Good will is also generated by repeat business with existing customers. Id. Good will is a legitimate business interest that an employer is entitled to protect. Kroeger v. Stop & Shop Co., Inc., 13 Mass.App.Ct. 310, 316 (1982).
The Court finds and rules that Staples has sufficient good will with regard to its relationship with those customers that were served by Feldman and Bartha while they were Staples’s employees to warrant protection from actions in violation of either the 1995 or 1999 agreements in issue here. This is particularly so in the case of the Staples Business Advantage Division where customers typically interact with one or more of Staples’s employees who provide and direct the provision of services and ordering techniques that are individually tailored to the customers’ particular needs. Staples’s good will is the product of the employee’s skill, knowledge of customer needs, “[p]rompt service, integrity, and loyalty.” Alexander & Alexander, Inc. v. Danahy, 21 Mass.App.Ct. 488, 497 (1986). Thus, insofar as it pertains to relations with Staples’s Business Advantage customers, a non-competition agreement is particularly appropriate for protecting Staples’s good will.
Further, the Court finds and rules that neither Feldman nor Bartha individually developed and possessed any significant good will in or with those customers. It was Staples which trained Feldman and Bartha in the Staples’ Way and gave them leads on accounts that enabled them to cultivate whatever relationships they had with Staples’s customers. Any close associations each had with these customers was in his capacity as a Staples Account Manager. Indeed, Feldman and Bartha argued, with some vigor, that they brought nothing with them to W.B. Mason, and they are having more than a little difficulty in effecting sales for W.B. Mason with their former Staples customers. This is hardly proof of any good will of their own with any of these customers.
At this stage of the litigation, the Court does not find there to b¿ any protectable trade secrets or other confidential information beyond that encompassed in the concept of good will. Either of the latter may later be established, but it has not sufficiently been done yet. More significantly, it has not been shown that the two employees here — Feldman or Bartha — have misappropriated any such information or transferred any such information to W.B. Mason.
Having determined that Staples’s good will is protectable, the Court next must determine whether injunctive relief is a proper method to effect that protection. Here the Court is guided by a reading of the plain language of the agreements. Each contains wording granting to Staples the right to enforce them by injunctive relief, as provided by the law of Massachusetts. Feldman and Bartha, each college graduates, fully understood the language of the agreements they signed. Each, therefore, acquiesced in Staples’s right to seek injunctive relief upon their breach.
The plaintiffs argue that Staples has demonstrated very little loss in volume of business following the exit of Feldman and Bartha. “(T]hat without more would not establish that [Staples] has not suffered a loss of the good will which it is the lawful purpose of the [agreements] to protect.” Middlesex Neurological Assoc., Inc. v. Cohen, 3 Mass.App.Ct. 126, 132 (1975).
A non-competition agreement, to be enforceable, also must be reasonable in geographical scope and length of time. See, e.g., Blackwell v. E.M. Helides, Jr., Inc., 368 Mass. 225, 228 (1975); All Stainless, Inc., supra, 364 Mass. at 779-80; Becker College of Business Admn. & Secretarial Science v. Gross, 281 Mass. 355 (1933). One year and either 50 or 100 miles from Staples’s office in Wallingford, Connecticut, or Bartha’s home in East Hartford, is certainly reasonable for the protection of the good will in issue here. Blackwell, supra, 368 Mass. at 229; Marine Contractors Co., Inc., supra, 365 Mass. at 289.
Thus, Staples has met its burden of showing a likelihood of success on the merits of a claim to protect its good will from harm by Feldman and Bartha and has demonstrated its right to injunctive relief in that exercise. The Court now must turn to the balancing of the harm to Feldman and Bartha from the granting of injunctive relief against them.
Contracts like those in issue here, “are scrutinized with particular care because they are often the product of unequal bargaining power and because the employee is likely to give scant attention to the hardship he may later suffer through the loss of his livelihood.” Sentry Ins. v. Firnstein, 14 Mass.App.Ct. 706, 707 (1982). Thus, Feldman and Bartha argue that enforcement of the agreements will impose undue hardships on them by barring them from earning a living, and supporting their families, in the business that they have spent essentially all of their adult working life.
The consequence of every covenant not to compete, however, is that the covenantor is deprived of a possible means of earning his living, within a defined area and for a limited time. That fact alone does not make such covenants unenforceable.
Marine Contractors Co., Inc., supra, 365 Mass. at 289.
Like the situation described by Chief Justice Tauro in Marine Contractors, Feldman and Bartha have not demonstrated any extraordinary hardships which would be caused to them by the enforcement of their promises not to compete. They may engage in any work other than sales of office supplies within the 50- or 100-mile limits, and they may sell office supplies in direct competition with Staples anywhere beyond the 50- or 100-mile limitations. They freely entered into *607 these agreements not to compete, see New England Tree Expert Co, Inc. v. Russell, 306 Mass. 504, 509 (1940), and they readily accepted the benefits ofbeing Staples sales employees.
Feldman and Bartha argue, however, that there were post-signing changes in circumstances that should absolve them from abiding by the contracts they knowingly executed. They point to the changes in their work and the frustrations arising from the computerization problems and the centralization of customer service personnel in 1998. This Court finds that these things are to be expected in an employment arrangement with a large company and do not, in and of themselves, relieve Feldman and Bartha from their contractual obligations. Nor does the change in the compensation plan relieve them from their agreements. Nothing was shown to indicate that the new compensation plan was unfair. Indeed, there was evidence that it was positively received by over 70% of Staples’s sales employees.
There are not sufficient hardships to Feldman and Bartha to shift totally away the balance from Staples's right to protect its good will. At the same time, there is enough potential hardship raised to cause this Court, in the exercise of its discretion to grant preliminary injunctive relief, to modify and narrow the breadth of the request so that it only covers those things necessary to protect the good will in issue. “It is settled in this Commonwealth that such contracts are divisible and will not be enforced as to any parts of the covenant that are not necessary for the protection of the good will of the employer’s business.” New England Tree Expert Co., Inc., supra, 306 Mass. at 509. Thus, it is not necessary, for example, to prevent Feldman and Bartha from working for W.B. Mason, even within the 50- or 100-mile radii, so long as they are not using any proprietary Staples information and so long as they are not calling upon the Staples customers that they called upon while in Staples’s employ, for the remainder of the one-year period from November 13, 2000, the date of their resignations.
Turning next to W.B. Mason’s actions, W.B. Mason did not sign any agreements with Staples. It was, however, fully aware of the agreements signed by Feldman and Bartha when it induced them to resign from Staples and come to work for W.B. Mason.[1]
Although difficult to quantify, Staples has demonstrated that it has been harmed by W.B. Mason’s actions in luring away Feldman and Bartha. These actions reveal a very substantial likelihood of success on the merits for Staples in its claim against W.B. Mason for intentional interference with contractual relations. See, e.g., United Truck Leasing Corp. v. Geltman, 406 Mass. 811, 812 (1990). Indeed, W.B. Mason’s offering of positions to Feldman and Bartha, while being fully aware of their agreements with Staples, then advising them to resign without warning and come immediately to work and start calling on their former customers on that same day, coupled with their counsel's preparation and filing of a comprehensive pre-emptive strike lawsuit within hours of the resignation, could well be seen to “raise an eyebrow of someone inured to the rough and tumble of the world of commerce.” Levings v. Forbes & Wallace, Inc., 8 Mass.App.Ct. 498, 504 (1979). At a minimum, the combined conduct of the three plaintiffs and the two third-party defendants could be found to have been wrongful for the reasons observed in BBF, Inc. v. Germanium Power Devices Corp., 13 Mass.App.Ct. 166, 172-73 (1982).
Staples thus has demonstrated its right to injunctive relief against W.B. Mason, similar to that against W.B. Mason’s newly acquired employees, Feldman and Bartha.

ORDER

For the reasons set forth above, this Court grants the following preliminary injunctive relief:
1. The plaintiff Harvey Feldman is preliminarily enjoined and restrained from directly or indirectly, in any way or fashion, calling upon or contacting, personally or in any written or electronic form, for any purpose related to the sale of office supplies, any employees or agents of those entities that remain named on the two lists designated “EX31 1/10/01 cs” and “EX 33 1/11/01 cs” attached hereto; and he is further enjoined and restrained from directly or indirectly transmitting or transferring to W.B. Mason Co., Inc., or any employee or agent thereof, any information learned about any such entities while as an employee of Staples Contract and Commercial, Inc.; all of the foregoing to remain in effect until November 13, 2001, or any further order of the Court, whichever first occurs.
2. The plaintiff Robert Bartha is preliminarily enjoined and restrained from directly or indirectly, in any way or fashion, calling upon or contacting, personally or in any written or electronic form, for any purpose related to the sale of office supplies, any employees or agents of those entities that remain named on the two lists designated “EX31 1/10/01 cs” and “EX 33 1/11/01 cs” attached hereto; and he is further enjoined and restrained from directly or indirectly transmitting or transferring to W.B. Mason Co., Inc., or any employee or agent thereof, any information learned about any such entities while as an employee of Staples Contract and Commercial, Inc.; all of the foregoing to remain in effect until November 13, 2001, or any further order of the Court, whichever first occurs.
3. The plaintiff W.B. Mason Co., Inc., and the third-party defendants Leo Meehan and Robert Davis, are preliminarily enjoined and restrained *608 from directly or indirectly, in any way or fashion, calling upon, contacting or directing any employees of W.B. Mason Co., Inc. from calling upon or contacting, personally or in any written or electronic form, for any purpose related to any future sales of office supplies, any employees or agents of those entities that remain named on the two lists designated “EX 31 1/10/01 cs” and “EX 33 1/11/01 cs” attached hereto, provided, however, that this restraint shall not prohibit the response to any contact for such purposes first initiated by any such customer; and they are further enjoined and restrained from directly or indirectly soliciting or accepting from Harvey Feldman or Robert Bartha any information learned by them about any such entities while they were employees of Staples Contract and Commercial, Inc.; and still further, they are enjoined and restrained from contacting, directly or indirectly, any present employees of Staples Contract and Commercial, Inc. or Staples, Inc. for any purpose whatsoever that would interfere in any way with any contractual relations between such employees and either Staples entity; all of the foregoing to remain in effect until November 13, 2001, or any further order of the Court, whichever first occurs.

 Certainly, W.B. Mason, when it approached Feldman and Bartha, had not so soon forgotten the 1998 litigation with Staples over similar W.B. Mason approaches to Staples’s employees in Rhode Island and Worcester.