van Gestel, Allan, J.
This matter is before the Court on the motion of the plaintiff, Tyler Technologies, Inc. (“Tyler”), for a Preliminary Injunction, Paper #3, against the defendant, John R. Reidy, d/b/a Pension Technology Group (“Reidy”).

BACKGROUND

In February 2006, Tyler acquired TACS, Inc. (“TACS”) and merged TACS into Tyler, such that TACS is now a division of Tyler. At the time of the acquisition, and for a very short time thereafter, Reidy was an employee of TACS and became an employee of the TACS division of Tyler.
TACS, before the merger, developed and sold a highly sophisticated software product that performs pension administration functions for public pension boards. It continues to do so as aTyier division. TACS’s pension product is one of only two full-service pension administration software products on the market that is specifically designed to comply with the unusually rigorous and complicated requirements of the Massachusetts public employees retirement law, G.L.c. 32, and the regulations promulgated thereunder.
TACS has been so successful that, by 2005, it had entered into contracts to sell its computerized pension administration system to 95 of the 106 pension boards in Massachusetts. These contracts are typically renewable on an annual basis.
TACS also sells upgrades to the software to conform with developments in the regulations promulgated under G.L.c. 32, maintenance agreements to install these upgrades and provides technical support services to customers during the life of the contracts. The contracts and maintenance agreements sold to Massachusetts public pension boards are said to account for approximately 65% of TACS’s annual revenue of $1.7 million.
In October 2001, TACS hired Reidy as its only full-time salesman. Initially, Reidy’s sole responsibility was to sell renewal contracts and system upgrades to TACS’s public pension board customers in Massachusetts. In that role, Reidy interacted directly with pension plan administrators and secretaries who ran the day-to-day operations of those boards.
When hired, Reidy was not given any written employment contract, nor was he asked to execute any non-competition or non-disclosure agreements.
In March 2005, Reidy and Brian Bowler (“Bowler”), TACS’s Director of Support Services, approached TACS’s president indicating an interest in purchasing the company. In the process that followed, Reidy and Bowler requested access to TACS’s financial, technical, business and personnel records. TACS contends that as a condition of allowing Reidy and Bowler access to TACS’s proprietary and confidential information, they were given, and each signed, documents entitled “Non-Compete Agreement.” Reidy signed his agreement on March 15, 2005, and Bowler signed his agreement on March 10, 2005. The two agreements are identical and will be referred to hereafter as the “Agreement.”
Because the Agreement is at the heart of this case, and because it is relatively short, the entire Agreement *670 signed by Reidy, except for the signature lines, is set forth hereafter.

Non-Compete Agreement

This Non-Compete Agreement (the “Agreement”) is made this 1st day of March 2005 between John Reidy (CONSULTANT) and TACS, Inc. who hereby agree as follows:
1. During consultation with TACS, Inc., the CONSULTANT may not, directly or indirectly, invest or engage in any business that is competitive with that of TACS, Inc., nor will CONSULTANT accept consultation or render services to a competitor as a director, officer, agent, employee, or consultant. Any exceptions to this Agreement must be with prior written consent.
2. The CONSULTANT will serve TACS, Inc. in an exclusive capaciiy. Accordingly, as a condition of consultation, the CONSULTANT must agree that, in the event that his/her consultation terminates for any reason, for a two year period, the consultant will not, directly or indirectly, either for himself/herself or through any kind of ownership as a director, agent, employee, or consultant, for any other person, firm, or corporation, call on, solicit, take away, or cause the loss of clients of TACS, Inc. on whom the CONSULTANT called or with whom he/she became acquainted during his/her consultation immediately preceding the termination of consultation. It is expressly agreed and understood that the remedy at law for breach of covenant is inadequate and that injunctive relief shall be available to prevent the breach thereof.
3. All information related to the business of TACS, Inc., including but not limited to the identity of customers and suppliers to TACS, Inc., forms, arrangements with such suppliers and customers, and technical data relating to its services and production of its services shall be treated as confidential by the CONSULTANT during and after termination or resignation of the CONSULTANT. Except with prior written approval of TACS, Inc., the CONSULTANT shall not disclose any such information at any time to any person except authorized personnel of TACS, Inc . . . [sic] In the event of a breach or threatened breach by the consultant of these provisions, TACS, Inc. shall, in addition to other remedies, be entitled to an injunction in [sic] restraining the consultant from disclosing, in whole or in part, any such information or advertising concepts, or from rendering any services to any person, firm, or corporation to whom such information may be disclosed or is threatened to be disclosed.
4. All data, forms, manuals, and other records and written material prepared or compiled by the CONSULTANT or furnished to the CONSULTANT while in the consultation of TACS, Inc. shall be the sole and exclusive property of TACS, Inc.
5.This Agreement does not create any right to consultation with TACS, Inc. and is in addition to other agreements that may have been signed by the CONSULTANT and TACS, Inc. Except as specified herein, this Agreement does not limit any rights of CONSULTANT or TACS, Inc. created by any other contracts or laws.
Despite the wording of the Agreement, Reidy was never engaged as a consultant by TACS, Inc. and never worked in that capacity for it. Rather, he continued as an employee of TACS, doing the same work as before. What he and Bowler did do, however, was examine the books, records and operations of TACS in their position as possible acquirers thereof. By late October 2005, however, Reidy and Bowler informed TACS that they did not intend to purchase the company.
TACS thereafter continued to seek a buyer; and in February 2006, TACS was acquired by Tyler.
Reidy resigned from Tyler on April 7, 2006. He then began developing his own entity called Pension Technology Group (“PTG”). In that connection, Reidy registered the internet domain name “pensiontechnologygroup.com” on May 14, 2006. Although just starting up, it appears clear that PTG will be in direct competition with Tyler for the public pension business of providing computerized assistance in administration in Massachusetts. In that regard, in August 2006, Reidy began soliciting many Massachusetts public pension groups to purchase PTG’s soon to be introduced competing product.
Some of TACS’s customers have indicated to it that they are awaiting the new PTG product before deciding to renew their contracts with TACS.
It is in this context that Tyler seeks preliminary injunctive relief against Reidy, barring him from “soliciting, taking away, or otherwise causing the loss of any of Tyler’s clients on whom Reidy called on or with whom Reidy otherwise became acquainted during his relationship with Tyler’s predecessor, TACS, Inc ... or Tyler.” Tyler also asks that Reidy be restrained from “reproducing, using or disclosing to any person or entity any of Tyler’s confidential information including, but not limited to the identity of customers and suppliers of, forms, arrangements with such suppliers and customers, and technical data relating to its services and production of its services.” Tyler also seeks a return of any confidential information taken from it by Reidy.
DISCUSSION
In order to prevail on its request for preliminary injunctive relief, Tyler bears the burden of showing: its likelihood of success on the merits; that it will suffer irreparable harm if the injunctive relief sought is not granted; and that its harm, without the injunction, outweighs any harm to Reidy from being enjoined. GTE Products Corp. v. Stewart, 414 Mass. 721, 722-23 *671 (1993); Packaging Indus. Group, Inc. v. Cheney, 380 Mass. 609, 616-17 (1980).
The granting of a preliminary injunction rests within the sound discretion of the Court. T&D Video, Inc. v. City of Revere, 423 Mass. 577, 580 (1996).
In assessing the situation here, the Court returns, as it must, to the Agreement. It is unusual in the circumstances. The Agreement by its plain language appears designed to regulate the employment or engagement of a consultant to TACS, not to insure security in a circumstance wherein a third parly seeks records and information in a due diligence review in anticipation of a purchase of the company. Reidy, however, already was an employee of TACS by the time the Agreement was presented to him, and had been for over three years. He did not, thereafter, become a consultant to TACS. Thus, as an employment-type agreement there are significant questions about consideration and its assignment to Tyler from TACS.[1]
On this point, the Court agrees with counsel for Tyler that the Agreement is not a personal services contract requiring consideration and an express right to an assignment. Thus, the Court will next examine the agreement as if it was intended to keep secure confidential information that was to be examined by a potential purchaser of the business. To this extent, at least, the provision of information is adequate consideration for the Agreement; and so, in this context, what does the Agreement say?
The first paragraph is limited to what the “CONSULTANT’[2] may do “during consultation.” There was no consultation and, therefore, this paragraph adds nothing to the mix.
Again, the second paragraph deals with the consequences of the CONSULTANT having “serve[d] TACS, Inc. in an exclusive capacity.” It is as “a condition of consultation” that the CONSULTANT must not, “in the event his/her consultation terminates . . . call on, solicit, take away, or cause the loss of clients to TACS, Inc. on whom the CONSULTANT called or whom he/she became acquainted during his/her consultation immediately preceding the termination of consultation.” There being no consultation in which Reidy ”serve[d] Tacs, Inc.,” this section has no application here.
The third paragraph relates to information about TACS, Inc. provided to the CONSULTANT. Yet again, there being no consultation, this section does not apply.
In reading the Agreement so strictly the Court may seem to be overreaching. That is not so however. “It is not the role of the court to alter the parties’ agreement.” Rogaris v. Albert, 431 Mass. 833, 835 (2000). Courts cannot directly add language to contracts that the parties did not choose to include even if necessaiy to permit the contract to become operative. This is, after all, TACS’s Agreement, for which it is wholly responsible.
Looking to the teachings in Cheney and Stewart, a significant factor militating against the injunctive relief sought is the fact that the likelihood of success on the merits is not clear. On the present record, Tyler, which has the burden as the party seeking the injunction, Robinson v. Secretary of Administration, 12 Mass.App.Ct. 441, 451 (1981), has not demonstrated Reidy’s non-compliance therewith. The issues swirling around the potential breaches of the Agreement, do not lead to any clear assessment of who, between the parties, will prevail.
Also, on the issue of irreparable harm, there does not appear to be much other than possible economic harm at stake. In that regard, the affidavit of Reidy, as well as the language in the Agreement, both strongly suggest that monetary damages are calculable and available if Tyler can ultimately prove its liability case.
Further, of course, “(e)conomic harm alone . . . will not suffice as irreparable harm unless ‘the loss threatens the veiy existence of the movant’s business.’ Hull Mun. Lighting Plant v. Mass. Mun. Wholesale Elec. Co., 399 Mass. 640, 643 (1987).” Tri-Nel Management, Inc. v. Board of Health of Barnstable, 433 Mass. 217, 227-28 (2001). At present, in Massachusetts alone, Tyler controls 95 out of only 106 public pension funds. No threat to the very existence of Tyler’s business has been demonstrated here.
What really is involved is ordinaiy competition for public pension support business. Such ordinary competition is not proctectable by an injunction. See, e.g., Richmond Brothers, Inc. v. Westinghouse Broadcasting Co., Inc., 357 Mass. 106, 111 (1970). Further, the clients or customers are entitled to complete freedom in choosing the entity they deem appropriate for their pension administration needs. In the absence of some clearly demonstrated interference with that choice, this Court will not interfere therewith.

ORDER

For the foregoing reasons, the Plaintiffs Motion for Preliminary Injunction, Paper #3, is DENIED. This denial, however, is not to be considered the law of this case, and is without prejudice to a later application for such relief if, after some appropriate discovery, such relief is warranted.

On the assignment question, of course, this Court needs more information on the nature and extent of the acquisition of TACS, Inc. by Tyler, and the subsequent merger. It may well be that no assignment was necessaiy.

The capitalized word CONSULTANT is not defined in the Agreement. It will, therefore, be assigned its usual meaning.