Fabricant, Judith, J.

INTRODUCTION

This action presents the plaintiffs’ effort to enforce restrictive covenants in agreements with its former employees. Before the Court is the plaintiffs’ motion for preliminary injunction. After hearing, and review of voluminous materials submitted by both sides, the Court concludes as follows.

BACKGROUND

The record before the Court, consisting of the verified complaint and affidavits submitted by both sides, provides the following factual background. The plaintiffs, Hilb, Rogal & Hobbs Company (“HRH Company”) and its subsidiary, Hilbs, Rogal & Hobbs of Massachusetts, LLC (“HRH” or “HRH of Massachusetts”), provide risk management and insurance services for business and individual clients. HRH Company is the eighth largest insurance intermediary in the United States, and the tenth largest in the world. It has 120 offices in the United States and the United Kingdom, and reported revenue of 711 million dollars for 2006. HRH focuses on property and casualty insurance and employee benefits consulting.
In 2002, HRH acquired Hobbs/OFJ Acquisition Corp. (“Hobbs”). Hobbs had acquired O’Neill, Finnegan and Jordan Insurance Agency, Inc. (“OFJ”) in December 1998. Defendants Alan Breitman and J. Brent Finnegan had been owners of OFJ prior to its acquisition by Hobbs. In connection with their sale of their business to Hobbs, each of them signed an employment agreement with Hobbs providing for guaranteed employment for five years, at increased compensation, and prohibiting each from soliciting employees of the company and from soliciting or accepting business from its customers for a period of two years after termination of their employment. Each agreement defined “company” as “Hobbs/OFJ Acquisition Corp. and any of its subsidiaries, including OFJ, affiliates or successors,” and further provided that it would “inure to . . . the successors and assigns of the Company.” Defendants Thomas Bowen, Joan Cunnick, and Theresa Flynn were employees but not owners of OFJ at the time of its sale to Hobbs. Each of them signed an employment agreement containing the same restrictive covenants. In 2004, Hobbs merged into HRH.
In 2003, HRH acquired Sheppard Riley Coughlin, Inc. (“SRC”). Defendant Thomas Sheppard was the largest shareholder of SRC, and received some six million dollars as a result of the acquisition. Defendant Charles Robinson was also a shareholder of SRC; he received approximately $600,000 from its sale. Defendant Steven Richards was an employee of SRC, but not a shareholder.
An asset purchase agreement governed the acquisition of SRC, and included a provision prohibiting Sheppard from soliciting or accepting, other than on behalf of HRH, “any risk management, insurance, or bond business from any of the customers of Seller” as of the February 28, 2003, date of the purchase, for a period of five years from that date. The asset purchase agreement also made reference to an employment agreement executed by Sheppard, for which he was paid separate consideration of $100,000. The employment agreement made Sheppard president of HRH, and prohibited him from engaging in the “insurance agency business” in specified Massachusetts and *382 Rhode Island counties for three years following termination of his employment with HRH, from soliciting or accepting customers or prospective customers of HRH as of the time of his termination for the same three-year period, and from hiring or soliciting any of HRH’s employees for one year after his termination.[1] The agreement granted the employer the option to seek liquidated damages in case of breach, according to a formula provided.
Robinson also signed both the asset purchase agreement and an employment agreement. His employment agreement guaranteed him employment for two years at higher compensation than he had previously received, but prohibited him from soliciting or accepting customers of HRH for two years after termination of his employment, and from hiring or soliciting HRH employees for one year. Richards signed a similar employment agreement, guaranteeing him employment for one year, at increased compensation, but prohibiting him from soliciting or accepting customers of HRH for two years after termination, and from hiring or soliciting HRH employees for one year.
Defendant Kevin Connelly became employed by HRH in 2004. In June of 2007, he signed a “Nonpiracy and Confidentiality Agreement,” which prohibits him from soliciting or accepting HRH customers, and from hiring or soliciting its employees, for two years after termination of his employment. In addition to the prohibitions recited, each of the employment agreements includes provisions barring use or disclosure of the employer’s trade secrets and confidential information, along with provisions authorizing enforcement by injunctive relief.
During their employment with HRH, each of the individual defendants interacted directly with customers and potential customers, and formed strong relationships with them or continued pre-exist-ing relationships. Some of these customer relationships began with referrals from within HRH, but others — most, it appears from the affidavits submitted — arose from networking and solicitation efforts made by the individual employees.
Robert Lockhart was president of HRH Company from 2003 to 2005, and was involved in its acquisition of SRC and hiring of Sheppard. He had a non-competition agreement with HRH Company, which expired in February 2007.[2] In September 2006, Lockhart founded Kinloch Holdings, which he describes in his affidavit as “a new, venture-capital backed insurance brokerage based in New York City,” made up of two subsidiaries, Kinloch Partners, Inc., and Kinloch Consulting (collectively, “Kinloch”). Lockhart formed Kinloch Partners by acquiring a pre-existing insurance brokerage firm in New York; through that entity Kinloch offers property and casualty insurance and related products and services. Lockhart formed Kinloch Consulting in April 2007 by purchasing a New York office of HRH; Kinloch Consulting offers employee benefits plans and related consulting services. As of December 12, 2007, Kinloch employed 135 individuals in its two New York offices, and had annual revenue of approximately 27 million dollars, “placing it just inside the top 100 brokerage firms in the United States,” according to Lockhart’s affidavit.
In September 2007, Kinloch began preparing to establish a Boston office. It made arrangements' to purchase a small insurance brokerage in the Boston area, and expects to close that deal in January 2008. Lockhart began recruiting brokers, agents, and other personnel in the Boston area. First among them was Thomas Sheppard, whom Lockhart had known when he worked at HRH. Sheppard and Lockhart agreed that Sheppard would leave HRH to work for Kinloch, and that, according to Lockhart’s affidavit, Sheppard would work in Kinloch’s New York office so as to be outside the geographic range of his non-competition agreement with HRH, and would “focus on management of Kinloch’s operations and building relationships with providers, such as insurance companies.” Sheppard’s affidavit puts it somewhat differently; he asserts that he will work in New York “for the near term,” “focusing on developing relationships with insurance companies and other providers ... as well as serving Kinloch’s New York and national client base.”
Between September and early December, Lockhart solicited a list of other HRH employees, most but not all of whom he knew from his time at HRH, to leave HRH and join Kinloch’s new Boston office. In his discussions with those employees who had employment agreements with HRH containing restrictive covenants, Lockhart promised that Kinloch would provide defense and indemnification. Although both Lockhart and Sheppard assert that Lockhart did all the recruiting himself without assistance from Sheppard, Sheppard does acknowledge that he spoke with Robinson about his plans, as well as with two other HRH employees, Tom Riley and Michael Feinberg, who did not leave HRH.
Riley’s affidavit states that Sheppard told Riley he “needed to be a part of it,” suggested Riley meet with Lockhart, discussed with him details of Kinloch’s plan to hire key people from HRH, and told Riley how excited he was about the plan. Feinberg’s affidavit states that Sheppard told him he would receive a call from Lockhart, and that he should take the call. Feinberg met with Lockhart because of his belief “that Sheppard apparently thought it was important that I meet with him”; Sheppard gave Feinberg “the clear impression that he wanted me to be a part of the team that was going to work for the Kinloch Companies.” The affidavits submitted indicate also that Lockhart told at least some of his recruits of Sheppard’s plan to move to Kinloch, and used that information as an inducement.
On December 12, 2007, twenty-four employees of HRH submitted resignations to Sheppard, and imme *383 diately began working for Kinloch. The employees’ resignation letters were in virtually identical form, each including a statement to the effect that “should you need to reach me directly for any reason, you may contact me through my attorney, Brandon F. White of the law firm of Foley Hoag LLP.” Attorney White represents all defendants in this action.
Sheppard himself resigned from HRH on December 13, 2007, notifying HRH Company’s president by telephone. He departed that day, without having notified HRH of the others’ resignations. He left their resignation letters in a sealed envelope on his desk.[3] Sheppard worked at Kinloch’s Boston office for the next two days, and then reported to its New York office the following Tuesday. On that date, according to his affidavit, he “met with an insurance company in New York, and looked at an apartment.” Sheppard does not claim that he has moved from his home in Wellesley, or that he plans to do so.
After their departure from HRH, the employees notified their clients of their transition, by e-mail and in some instances by telephone or in person, and Kinloch sent all of the employees clients a “wedding-sfyle” announcement by e-mail. Sheppard met with one client, TA Realty, on the morning of the same day he left HRH; TA Realty was one of the clients HRH had acquired in purchasing SRC. Each of the defendant employees denies soliciting any of their HRH clients or any other HRH employees, and denies taking or using any confidential information from HRH, although some acknowledge having kept their client contact information. The affidavits submitted indicate that several of the defendant employees met with clients, and several of them acknowledge having accepted business from clients who responded to their notification. One such client, ITR, later reported to Riley that it had transferred its business after having been told by Sheppard, Robinson and Richards, inaccurately, that “substantially all of the individuals who service the ITR account had joined the Kinloch companies.”
On December 13,2007, the day after the employees’ mass departure, Alan Breitman telephoned HRH employee Denise Stevenson, told her that he thought Kinloch would be interested in her, and suggested that she could obtain more information from Kinloch’s website. Stevenson registered on the website, and received a job offer by e-mail. She and Breitman met for lunch the next day; he answered her questions about Kinloch and the terms of the offer, and added certain terms, including indemnification. She accepted the offer and went to Kinloch’s Boston office, where she observed the group of former HRH employees, along with boards showing lists of HRH clients and information about the status of efforts to enlist them to transfer their business to Kinloch. Soon thereafter, Stevenson changed her mind and returned to HRH.
Breitman telephoned HRH employee Stuart Rubinstein on Sunday, December 16, 2007. Breitman asserts that he did so in response to calls from Rubinstein, and urging from Stephenson. Breitman agreed to a salary for Rubinstein, as well as other terms, including indemnification and defense for claims by HRH. A few days later, Brent Finnegan called Rubenstein with an increased offer. Rubinstein declined the offer and stayed at HRH.
Within the week after the employees’ departure, some twenty-four clients who were previously served by one or more of the departing employees submitted “broker of record” letters transferring their business from HRH to Kinloch, or otherwise notified HRH of such a transfer. At least five of these clients were among those acquired from SRC. December is a likely time for transitions in the insurance business, since many customers renew their property and casualty insurance policies during the month of December.
HRH filed this action on December 20, 2007. The verified complaint claims breach of contract, breach of fiduciary duty, and unjust enrichment against each of the nine employee defendants, breach of fiduciary duty by Kinloch,[4] tortious interference with contractual relations by Sheppard, Breitman, and Kinloch, civil conspiracy by all defendants, violation of G.L.c. 93A by Kinloch, Sheppard, and Breitman, and unjust enrichment or constructive trust against Kinloch.[5] The complaint seeks preliminary and permanent in-junctive relief and damages. The Court issued an order of notice, and heard argument on the request for preliminary injunction on Friday, December 21, 2007.

DISCUSSION

“A party seeking a preliminary injunction must show that (1) success is likely on the merits; (2) irreparable harm will result from denial of the injunction; and (3) the risk of irreparable harm to the moving party outweighs any similar risk of harm to the opposing party.” Cote-Whitacre v. Department of Pub. Health, 446 Mass. 350, 357 (2006) (Spina, J., concurring), citing Packaging Indus. Group, Inc. v. Cheney, 380 Mass. 609, 616-17 (1980). Here, to warrant issuance of a preliminary injunction against its former employees, HRH must show, first, a likelihood that it will prevail at trial in showing both that the restrictive covenants in the employment agreements are enforceable against each of them and that each has violated those provisions, and second, that in the absence of an injunction between now and the time of trial, it will suffer harm sufficiently severe and irreparable to outweigh the harm that an injunction will impose on the defendants.[6] As to Kinloch, HRH must show, in addition to enforceability and breach by the employees, a likelihood that it will succeed in proving that Kinloch has encouraged or induced that breach, and did so by improper means or for an improper motive, or that it otherwise engaged in unfair competition or unfair or deceptive acts or practices.
*384 Covenants not to compete, and similar restrictive covenants in employment agreements, are enforceable only to the extent necessary to protect legitimate business interests of the employer, and only if “reasonably limited in time and space, and consonant with the public interest." Boulanger v. Dunkin’ Donuts, Inc., 442 Mass. 635, 639 (2004), citing Marine Contrs. Co. v. Hurley, 365 Mass. 280, 287-88, 289 (1974), and All Stainless, Inc. v. Colby, 364 Mass. 773, 778 (1974). Reasonableness is to be evaluated “in light of the facts in each case.” Id., citing Marine Contrs. Co., 365 Mass. at 287, and Salman v. Smith, 313 Mass. 135, 145 (1943).
The employer interest invoked here is customer good will.[7] An employer’s customer good will is a legitimate business interest that may properly be protected by restrictive covenants. See Boulanger, 442 Mass. at 641, citing Marine Contrs. Co., 365 Mass. at 287. A court must consider, however, based on the facts of the particular case, whether the good will in issue belongs to the employer or to the employee. See Sentry Ins. v. Firnstein, 14 Mass.App.Ct. 706, 708 (1982) (“The objective of a reasonable noncompetition clause is to protect the employer’s good will, not to appropriate the good will of the employee.”); Carl Getman & Cleary Schultz Ins., LLC v. USI Holdings Corp., Civil No. 2005-3286, 2005 WL 2183159, at *3 (Mass.Super.Ct. Sept. 1, 2005) [19 Mass. L. Rptr. 679] (‘The good will . . . that [the former employer] legitimately may preserve is its own good will, not the good will earned by the employee that fairly belongs to the employee”); First E. Mortgage Corp. v. Gallagher, Civil No. 1994-3727, 1994 WL 879546, at *1 (Mass.Super.Ct. July 21, 1994) [2 Mass. L. Rptr. 350] (denying injunction where good will “was the defendant’s own making, which he had developed with customers as a result of his own enthusiasm, personality and abilities”); compare W.B. Mason Co. v. Staples, Inc., Civil No. 2000-5042, 2001 WL 227855, at *5 (Mass.Super.Ct. Jan. 18, 2001) [12 Mass. L. Rptr. 603] (salesmen for office supply retailer had not developed their own good will).
Here, the record before the Court indicates that customer good will is the most significant asset a business of the type in issue here has. The record also indicates, however, that the nature of the business is such that individual producers and consultants tend to develop their own good will with clients, independent of that of their employer, such that a particular client’s good will may belong as much to the employee as to the employer. See generally Getman v. USI Holdings Corp., Civil No. 2005-3286, 2005 WL 2183159, at *3 (Mass.Super.Ct. Sept. 1,2005) (discussing good will in insurance brokerage business). That characteristic of the business weighs against enforcement of restrictive covenants.
As to some of the good will in issue, however, ownership has been established by purchase and sale transactions — that is, HRH bought a set of client accounts by buying preexisting businesses from some of the employee defendants. That is the case particularly with respect to Sheppard, who received some six million dollars for his interest in SRC. In selling SRC, Sheppard sold the good will of its clients, as well as his right to trade on his name and reputation in the industry other than for the benefit of HRH for the time periods specified in his employment agreement, and in the region identified. In light of the consideration Sheppard received for the sale, the time and region specified appear entirely reasonable. For Sheppard to renege on his agreement would be, in substance, to take back what he sold, while keeping the proceeds of the sale. See Alexander & Alexander, Inc. v. Danahy, 21 Mass.App.Ct. 488, 496 (1986). As to Sheppard, the Court concludes that HRH has established a strong likelihood that it will prevail in proving that his employment agreement is enforceable.[8]
The record also provides strong evidence that Sheppard has breached his agreement, and is likely to continue to do so if not enjoined. Although he and Lockhart appear to have made some efforts to keep him just barely within the lines drawn by the contract, it is clear that Sheppard has crossed those lines. His New York assignment, by his own description, is “for the near term” only; absent an injunction, it appears highly likely that he will head Kinloch’s Boston office in the near future. Despite his denials of solicitation of employees and customers, the record provides strong evidence that Sheppard solicited at least one client, ITA, that he directly solicited Riley and Feinberg, and that he solicited other employees indirectly by allowing Lockhart to use his name and information about his plans as an inducement. HRH has established a likelihood of success on the merits of its claim of breach of contract against Sheppard.
Robinson is in a similar position, also having entered into his employment agreement in the context of the sale to HRH of his interest in SRC. The consideration he received was less, but still substantial, and the length and scope of his restrictive covenants are correspondingly less. The evidence of his breach is also strong, at least with respect to accepting business from HRH customers.
Defendants argue strenuously that covenants not to accept business should not be enforced, because they violate the rights of the clients. The Court is not persuaded, at least with respect to an agreement entered into in the context of the sale of a business, as Robinson’s agreement was. For the reasons already discussed with respect to Sheppard, that context would fully justify a covenant not to compete. If Robinson could have agreed, in return for the purchase price, to remove himself entirely from the industry in the area, surely he could agree to make himself unavailable to a particular set of clients. The Court therefore concludes that HRH has established a likelihood of success on the merits of its claim against Robinson of breach of contract.
*385 Breitman and Finnegan also executed their employment agreements in the context of the sale of their ownership interest in a business, OFJ. Their agreements expressly authorized assignment to any successor of Hobbs, and defined the company, whose employees and clients they would not solicit, to include any such successor. The restrictions imposed by these agreements are narrow in scope, prohibiting only soliciting employees and soliciting or accepting business from clients of the company, and reasonably limited in time. Strong evidence indicates that both Breitman and Finnegan have violated these restrictions, by soliciting both Stevenson and Rubinstein, and by accepting, if not soliciting, business from HRH customers. The Court therefore concludes that HRH has established a likelihood of success on the merits of its claim of breach of contract by Breitman and Finnegan.
The other five employee defendants stand in a different position. None executed an employment agreement in the context of the sale of an ownership interest in a business. To the contrary, four of them — Richards, Bowen, Cunnick, and Flynn — did so when his or her employer was sold, so that he or she may have been faced with a choice between sudden unemployment, and signing an agreement with restrictive covenants. The fifth, Connelly, faced a similar choice, when called upon to sign an agreement three years into his employment with HRH. That circumstances does not render the agreements void for lack of consideration. See Economy Grocery Stores Corp. v. McMenamy, 290 Mass. 549, 552 (1935); Sherman v. Pfefferkorn, 241 Mass. 468, 473 (1922). It does, however, weigh in the Court’s evaluation of equitable factors in enforce by means of the grant of an injunction. See generally Sentry Ins., 14 Mass.App. at 707, quoting Restatement (Second) of Contracts §188, comment g (1981) (post-employment restraints construed strictly against employer because “they are often the product of unequal bargaining power and because the employee is likely to give scant attention to the hardship he may later suffer through the loss of his livelihood”); see also IKON Office Solutions, Inc., 59 F.Sup.2d 125, 130-32 (D.Mass. 1999) (expressing doubt about adequacy of continued employment as sole consideration for post-employment non-competition agreement under current Massachusetts law); Tyler Techs., Inc., v. Reidy, Civil No. 2006-4404, 2006 WL 4119598, at *3 (Mass.Super.Ct. Oct. 30, 2006) [21 Mass. L. Rptr. 669] (questioning adequacy of consideration where defendant was already an employee when agreement was signed).
The purported purpose of the agreements is to protect the employer’s goodwill. As discussed supra, however, in the business involved here, based on the material presently before the Court at this preliminary stage, client good will appears to attach at least as much to the employee as to the employer. The four employees who sold their businesses to HRH or its predecessor sold it their customer goodwill; their employment agreements serve to ensure that they will not take back what they sold. These five employees made no such sale. The effect of their agreements, it appears on this preliminary record, would be to transfer to the employer the goodwill they have accumulated through their individual efforts. The Court is not persuaded, at this stage, that these agreements are enforceable. For that reason, the Court does not find a likelihood of success on the merits of HRH’s claims against these five employees.
As to Kinloch, HRH’s primary claim is tortious interference with contractual relations.[9] To prevail on that claim, HRH will be required to show that Kinloch knew of its contracts with its employees, that it induced the employees to breach their contracts, and that it did so for an improper motive or by improper means .See United Truck Leasing Corp. v. Geltman, 406 Mass. 811, 812-16 (1990). The record before the Court provides strong evidence for each of these elements. Kinloch clearly knew of the agreements, and actively encouraged the employees to break them, offering defense and indemnification for anticipated litigation arising from such breach. Such conduct supplies the element of improper means. See Melo-Tone Vending, Inc. v. Sherry, Inc., 39 Mass.App.Ct. 315, 320 (1995); see also W.B. Mason Co. v. Staples, Inc., Civil No. 2000-5042, 2001 WL 227855, at *8 [12 Mass. L. Rptr. 603]. The Court therefore concludes that HRH has established a likelihood of success on the merits of its claims against Kinloch.
To obtain a preliminaiy injunction, HRH must also show that it is threatened with irreparable harm, and that the balance of harms weighs in its favor. The harm threatened is, of course, the loss of client business. Such loss can be identified, and can be quantified for any particular period of time; HRH knows the identify of its clients, and the amount of revenue it earns from each. The problem, however, is the long-term. Once a client transfers its business, there is no way to determine how long it would otherwise have stayed with HRH, particularly in the absence of the individual employee familiar to it. For that reason, the potential long-term harm cannot be fully remedied by money damages.
On the other side of the scale, the record presented does not establish that either Kinloch or any of the four individual defendants against whom HRH has established a likelihood of success — Sheppard, Robinson, Breitman, and Finnegan — will suffer significant harm from the issuance of a narrowly drawn injunction. Sheppard has been paid handsomely for his interest in SRC; even if he were prevented from working entirely, he could hardly complain of financial hardship. The other three employees are free to continue working in the business, and to work for Kinloch, provided that they do so without soliciting or accepting business from HRH’s customers, and without soliciting its employees. As for Kinloch, it is free to pursue its plans for its Boston office, and to compete with HRH. It must do so fairly, however, without inducing HRH employees to breach their contracts. Ihe public interest, in the *386 Court’s view, supports issuance of a narrowly draw injunction to uphold the contracts of these four employees and to prevent unfair competition. Accordingly, the Court will issue a preliminary injunction against these four employees and Kinloch.[10]
The parties have not addressed the question of whether HRH should be required to post a bond, and if so, in what amount. The Court will not require a bond at this time, but will consider any request that may be made, pursuant to Superior Court Rule 9A with appropriate documentation.

CONCLUSION AND ORDER

For the reasons stated, the plaintiffs’ Motion for Preliminary Injunction is ALLOWED in part and DENIED in part. The Court orders that a preliminary injunction issue against defendants Sheppard, Robinson, Breit-man, and Finnegan in the form attached hereto.
EXHIBIT A
[PROPOSED] TEMPORARY RESTRAINING ORDER
The Court received evidence and heard argument on Plaintiffs’ Motion for a Temporary Restraining Order and considered submissions, including affidavits.
Having considered these submissions, the Court finds that: (1) Plaintiffs have demonstrated a likelihood of success on the merits on their claims for breach of contract, breach of fiduciary duty, tortious interference with contractual relations, civil conspiracy, violations of Massachusetts General Law Chapter 93A, and unjust enrichment; (2) Plaintiffs will suffer irreparable Harm if Defendants continue to solicit employees of Hilb, Rogal & Hobbs of Massachusetts, LLC (“HRH”) and continue to solicit and/or accept business from HRH customers or prospective customers, and this harm outweighs any potential harm to the Defendants; and (3) the public interest is consistent with and will be served by the issuance of a temporary restraining order.
It is therefore ORDERED:
Defendants Thomas W. Sheppard (“Sheppard”), Thomas D. Bowen (“Bowen”), Alan S. Breitman (“Breit-man”), Kevin M. Connelly (“Connelly”), Joan L. Cunnick (“Cumick”), J. Brent Finnegan (“Finnegan”), Theresa H. Flynn (“Flynn”), Steven B. Richards (“Richards”), Charles R. Robinson (“Robinson”), Kinloch Consulting Group, Inc. (“Kinloch Consulting”), Kinloch Partners, Inc. (“Kinloch Partners”), and Kinloch Holdings, Inc. (“Kinloch Holdings”), are preliminarily enjoined as follows:
1. Sheppard is enjoined from engaging in any insurance agency business within the “Non-Compete Restricted Area” of Suffolk, Middlesex, Essex, Norfolk, Worcester, Plymouth and Bristol Counties in Massachusetts, and Providence County in Rhode Island;
2. Sheppard, Breitman, Bowen, Connelly, Cunnick, Finnegan, Flynn, Richards, and Robinson are enjoined from directly or indirectly soliciting or accepting the business of all customers or prospective customers of HRH as of December 12, 2007;
3. Sheppard, Breitman, Bowen, Connelly, Cunnick, Finnegan, Flynn, Richards, and Robinson are enjoined from directly or indirectly soliciting or hiring individuals that were employees of HRH on, or during the twelve months prior to, December 12, 2007;
4. Kinloch Consulting, Kinloch Partners, and Kinloch Holdings, including their employees and agents, are enjoined from soliciting or accepting the business of entities that were HRH Customers as of December 12, 2007;
5. Kinloch Consulting, Kinloch Partners, and Kinloch Holdings, including their employees and agents, are enjoined from soliciting individuals that were employees of HRH on. or during the twelve months prior to, December 12, 2007.
This Temporary Restraining Order shall remain in place until the Court rules on Plaintiffs’ Motion for a Preliminary Injunction. It is therefore ORDERED that plaintiffs’ Motion for Preliminary Injunction be beard
before this Court on_o’clock_in on the_
day of 2007.
This Order continues in effect until modified by a further order of a judge of this or a higher court.

The agreement defined prospective customers as those HRH had solicited within one year.

Lockhart’s affidavit asserts that HRH forced him to resign, after which he brought and later settled a suit against HRH for defamation.

Sheppard’s affidavit asserts that he left immediately because he was instructed to do so, and that he “did not get a chance to draft a formal resignation letter.”

The allegation in this regard is that Kinloch “induced, encouraged, and participated in the breach of fiduciary duties owed to HRH” by the employee defendants.

This claim alleges that “all fees and income realized by the Kinloch Companies from the provision of services for former HRH Customers should be held in constructive trust for the benefit of Plaintiffs.”

The Court has scheduled a trial on the merits of the claim for permanent injunctive relief for May 12, 2008.

HRH also cites its trade secrets and confidential information, but the record does not identify any such information in issue, and does not indicate that any of the defendants has taken or used information belonging to HRH.

Sheppard asserts in his affidavit that “HRH drafted the agreement and demanded that I sign it as a condition of my employment. None of the terms of the agreement were negotiated.” In light of the nature of the transaction and the amount involved, the Court finds this assertion so implausible as to undermine the credibility of Sheppard’s affidavit overall.

The other claims, listed supra, appear essentially derivative of that claim.

Defendants argue that HRH should be denied injunctive relief because of claimed misconduct in litigation between HRH and Kinloch in New York. The Court has reviewed the transcript submitted in support of this argument. The information provided is not sufficient to persuade the Court that HRH’s misconduct, as found by that Court in that instance, is of such broad scope that its consequences should extend beyond that case.